**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Otha C. BAILEY, Sr.,**
**Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Major MOSS, Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Jimmie Lee WHITNEY,**
**Defendant-Appellant.**

**Nos. 78–1623, 78–1625 and 78–1682.**

United States Court of Appeals,
Ninth Circuit.

Oct. 1, 1979.

Rehearing Denied in Nos. 78–1623 and
78–1682 Nov. 9, 1979.

John M. Darrah, Seattle, Wash., J. Hartly Newsum, Nuxoll & Newsum, Bellevue, Wash. (argued), Francis J. Diskin, Asst. U.S. Atty., Seattle, Wash., for plaintiff-appellee.

Daniel H. Smith, Smith, Kaplan & Whithey, Seattle, Wash., for defendants-appellants.

Before DUNIWAY and ELY, Circuit Judges, and FITZGERALD,* District Judge.

FITZGERALD, District Judge:

Otha C. Bailey, Sr., Jimmie Lee Whitney, and Major Moss appeal from judgments of conviction following a jury trial with six co-defendants, not parties to this appeal. The jury found Bailey, Whitney, Moss and four other defendants[1] guilty of conspiracy to possess with intent to distribute heroin and cocaine.[2] In addition to conspiracy, Whitney was convicted of two counts of possession with intent to distribute heroin and cocaine[3] and four counts of knowingly and intentionally using a communications device to facilitate the conspiracy.[4] Besides conspiracy, Bailey was convicted of five counts of knowingly and intentionally distributing heroin,[5] and thirty-eight communications counts, and Moss was convicted of eleven counts of using a communication device to facilitate the conspiracy. We affirm the convictions of Bailey and Whitney, and reverse the conviction of Moss.

Over a period of one and a half years, commencing in 1976, the Drug Enforcement Administration (DEA) conducted an investigation centered on Otha C. Bailey, Sr., who was suspected of being the hub of a narcotics distribution system in the Seattle area. In April 1976, a search of Seafair Moving and Transfer, a business operated by Bailey and co-defendant Bonnie Faye Williams, uncovered narcotics paraphernalia and heroin residue on the premises. A court authorized touch-tone decoder was installed on Seafair's telephone line on February 15, 1977, and the suspects were placed under surveillance. In March and April 1977, a government informant was used to make five heroin buys from Bailey's organization.

Through the use of surveillance, touch-tone decoders, and information gained from the informant, the following pattern of distribution emerged. Bonnie Faye Williams would accept orders to buy narcotics; a call then would be made from Seafair to Daniels' answering service. Daniels operated two cleaning establishments known as "Dun-Rite" and "Nu Way." After receiving the call, Daniels would visit Seafair, from which location Bonnie Williams would soon depart to make delivery of the narcotics. Various "code words" were used when referring to the drug transactions.

Following one transaction between Bonnie Williams and the DEA informant, Bailey was observed meeting with Williams. Bailey was then followed to a bank where he deposited cash, including one prerecorded bill which the informant had passed to Williams at the drug sale.

---

* Honorable James M. Fitzgerald, United States District Judge for the District of Alaska, sitting by designation.

1. After presentation of the government's case-in-chief, the trial judge dismissed a number of counts and an amended indictment was prepared containing the remaining counts. In the amended third superceding indictment, Bailey, Whitney, Moss, and five others, Bonnie Faye Williams, Robert King, Marilyn Williams, Theodius Daniels, and Howard Bible, were charged with one count of conspiracy and sixty-three counts of various individual substantive offenses. The judge submitted the case to the jury in two stages. On January 27, 1978, the jury returned verdicts with respect to the conspiracy count, the distribution counts, and the possession with intent to distribute counts finding all defendants guilty as charged except Howard Bible. On January 31, 1978, the jury returned verdicts finding the seven remaining defendants guilty of some or all of the communication counts.

Prior to oral argument, upon learning that King had died, the judgment of conviction as to Robert King was vacated and remanded to the district court with instructions to dismiss the indictment.

2. 21 U.S.C. § 846.

3. 21 U.S.C. § 841(a)(1); 21 U.S.C. § 841(b)(1)(A).

4. 21 U.S.C. § 843(b).

5. 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) and 18 U.S.C. § 2.

An interview with an informant in San Diego identified Whitney as the source of Bailey's heroin supply, and a check of telephone records revealed calls placed over a period of months between Whitney's San Diego telephone numbers and the Seafair number. The touch-tone decoder at Seafair also established contacts to the telephones of Howard Bible and Major Moss, and to an after-hours establishment where Moss was employed as a cook.

Based in part on the foregoing information, a court-ordered wiretap was obtained to intercept incoming and outgoing calls from the telephone at Seafair.

This appeal raises two main issues: Whether the government's applications for court orders authorizing the wiretap on Bailey's business telephone complied with statutory requirements, and whether the evidence admitted at trial was sufficient to establish the participation of Moss in the single over-all conspiracy. In addition, appellants raise the issue of whether DEA agent Fitzgerald's expert opinion testimony regarding code words used in narcotics transactions constituted reversible error.

## I. THE EXPERT TESTIMONY

■ At trial, over objection of defendants, DEA agent Dennis Fitzgerald testified for the government as an expert witness regarding the meaning and use of code words and commonly used phrases in drug transactions.[6] The trial judge disallowed questions regarding specific alleged code words used by defendants in their recorded

conversations to refer to drugs and drug traffic.[7] The judge allowed the case agent to testify to the interpretation of general "street language" terms used in drug activity. The agent's testimony was therefore restricted to interpretation of commonly used drug jargon, and did not constitute an interpretation of the meaning of the telephone conversations themselves.[8] We hold it was clearly within the trial judge's discretion to admit Fitzgerald's testimony as an expert. Appellants additionally argue that as case agent, Fitzgerald's opinion lacked objectivity. Such an argument goes to the weight of Fitzgerald's testimony but it does not make the evidence inadmissible. *United States v. Smith*, 519 F.2d 516, 521 (9th Cir. 1975).

## II. THE WIRETAP

A court-ordered wiretap of Seafair's telephone was authorized on August 15, 1977, resulting in the recording of hundreds of telephone calls between August 15 and September 9, 1977. At trial the government played tape recordings of numerous telephone calls between defendants which served to implicate them in a narcotics enterprise. The appellants contend the wiretap was illegal on a number of grounds.

■ Appellants' contention that the wiretaps statute, Title III of the Omnibus Crime Control and Safe Streets Act of 1968,[9] is unconstitutional on its face as violative of the Fourth Amendment must be rejected in light of *United States v. Turner*, 528 F.2d

---

6. For example, he testified that when discussing amounts of heroin the word "one" refers to "one ounce," and that when referring to amounts of money, the last two digits are commonly dropped, making a reference to $2300, "23," or $1300, "13." He also testified that according to his experience from prior investigations, the phrase "good news" was used to mean that the person had heroin and that it could be purchased. R.T. 1345. The question "How strong are you?" or "How much can you go?", according to Fitzgerald, was code for a question about how much money was available for the purchase. The phrase "the same thing" was interpreted by Fitzgerald from his experience to mean that the terms of a previous purchase of narcotics would apply to the pur-

chase or sale being negotiated. R.T. 1340–1364.

7. For example, the words "Phillips screwdriver" allegedly referred to heroin.

8. The trial judge required Fitzgerald's testimony to be given before or after all of the conversations were played for the jury and rejected the prosecution's proposal of questioning Fitzgerald as to the meaning of words used in the individual conversations as each recorded telephone call was played for the jury. R.T. 1293–1297. We express no view as to whether the prosecution's proposed procedure would have been proper.

9. 18 U.S.C. § 2510, et seq.

143, 158–159 (9th Cir. 1975), *cert. denied sub nom. Lewis v. United States,* 423 U.S. 996, 96 S.Ct. 426, 46 L.Ed.2d 371 (1975), *sub nom. Hackett v. United States,* 429 U.S. 837, 97 S.Ct. 105, 50 L.Ed.2d 103 (1976), which squarely held Title III to be constitutional under the Fourth Amendment.

Alternatively, appellants argue that the government's application for a wiretap authorization was inadequate in two respects. First, appellants contend that the government's application was *pro forma,* and that the authorizing officer [10] improperly relied upon the representations made in the affidavits of the investigating officer rather than undertaking an independent examination. Second, appellants contend that the evidence should have been suppressed because normal investigative techniques had proved highly successful and therefore the necessity requirement of 18 U.S.C. § 2518(1)(c) was not met.[11]

### A. *Authorization*

■ A government attorney, having received authorization from then Assistant Attorney General Benjamin Civiletti, submitted the application for a wiretap to the district court. The application contained a description of the purpose, probable cause, and necessity for the wiretap, and was supported by a 32-page affidavit of the investigating officer which contained a detailed factual history of the investigation up to that time, including names, dates, locations, and information obtained through touch-tone decoders, surveillance, and undercover transactions.

The district judge, on August 15, 1977, authorized use of the wiretap for 20 days. The wiretap authorization was extended on September 2, 1977 for another 10 days or until the information sought from the wiretap was obtained, whichever first occurred. The extension application was authorized by Assistant Attorney General John Harmon, and was supported by affidavit of the

investigating officer with summaries of the information obtained from the wiretap and a description of the goals remaining in the investigation. On September 9, 1977, the wiretap was terminated.

The contention that the government's two applications were *pro forma* must be rejected. The applications contained an exhaustive description of the investigation and outlined the information to be sought through the wiretap on Bailey's business telephone. It need not be shown that the authorizing official had knowledge independent of the affidavit or made specific findings of fact. *United States v. Martinez,* 588 F.2d 1227, 1233 (9th Cir. 1978). "Once a proper authorizing officer is properly identified . . . thereby fixing on him the responsibility for a particular authorization, the basis of which . . . he gave the authorization is not . . . subject to review for compliance with § 2516(1)." *United States v. Turner, supra* at 151. It is not necessary to show that the Attorney General reached his decision only after evaluation of the factual foundation for the recommendation upon which he relies. We conclude that the government's applications were sufficiently detailed, supported by an adequate affidavit, and properly authorized.

### B. *Necessity*

■ The "necessity" requirement exists to limit the use of wiretaps because of their highly intrusive nature and to "assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). Wiretaps are not to be used routinely as the first step in criminal investigations. *United States v. Giordano,* 416 U.S. 505, 515, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). However, the necessity requirement is also to be interpreted in a practical and commonsense fashion, and

---

**10.** 18 U.S.C. § 2516(1).

**11.** This provision of the Omnibus Act requires that each application for a wiretap include:

a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

need not therefore be used only as a last resort. *United States v. Martinez, supra* at 1231; *United States v. Abascal,* 564 F.2d 821, 825 (9th Cir. 1977), *cert. denied sub nom. Frakes v. United States,* 435 U.S. 942, 98 S.Ct. 1521, 55 L.Ed.2d 538, *cert. denied* 435 U.S. 953, 98 S.Ct. 1583, 55 L.Ed.2d 804 (1978).

■ The necessity for the wiretap must be readily apparent from the affidavit, and the affidavit must show either that "normal investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time," or where such techniques have not been employed, that the techniques "reasonably appear unlikely to succeed if tried or to be too dangerous." *United States v. Spagnuolo,* 549 F.2d 705, 710 (9th Cir. 1977); *see United States v. Baker,* 589 F.2d 1008 (9th Cir. 1979).

■ It is clear from the affidavit in this case that the investigation prior to the application had been quite productive. In this regard, appellants argue that the government had evidence sufficient to convict Bailey, Bonnie Williams, and Daniels, and that it knew about all of the other defendants eventually charged except King, but had insufficient evidence to convict them. They contend that Whitney's activities were susceptible to prosecution through a search warrant based on surveillance. Appellants argue that the statute should not be construed to permit narcotics agents to evade the normal investigative technique requirements simply because there remain some unknown details or unprosecutable associates.

Nevertheless, the affidavit in support of the initial application noted several deficiencies in the investigation up to that time. Surveillance of Bailey had been in large part unsuccessful, and there had been no informant successful in making a purchase directly from Bailey. Other normal investigative techniques, such as use of search warrants and touch-tone decoders, had revealed neither the source of narcotics nor the details of the distribution operation. Obtaining additional toll records would not establish the identity of the parties to the conversations, nor the contents of the conversations. Although an investigative grand jury was considered, it was rejected because it would reveal the investigation to Bailey. Furthermore, the government had concluded that an offer of immunity to Williams would not be successful, and that it would be improper to immunize Bailey or Daniels, the "leaders" of the scheme. Thus, the wiretap was sought, after months of investigation, to identify Bailey's source of supply, the manner by which Bailey distributed the drugs, the identity of other co-conspirators, as well as the nature and extent of Bailey's heroin distribution operation.

The application for an order authorizing the ten day extension was supported by an affidavit summarizing the information already obtained from approximately sixty-four narcotics related calls, including conversations between Moss and Bailey for the purchase of heroin by Moss, and conversations which corroborated information that Whitney was acting as source of supply to Bailey. The affidavit stated that more information was sought regarding the exact functions performed by apparent co-conspirators, the identity of the Mexican source of supply who provided Whitney with the heroin for Bailey, the manner in which Whitney delivered to Bailey, and the exact scope of the distribution network.

In this case, the need for the wiretap arose when investigators, notwithstanding some success, had been unable, after six months of intensive effort, to learn of the full extent of the operation. The statute does not mandate the "indiscriminate pursuit to the bitter end of every nonelectronic device . . . to a point where the investigation becomes redundant or impractical . . . ." *United States v. Baker, supra,* at 1013; *see United States v. Martinez, supra* at 1232. Upon the showing made in the applications, we conclude that the applications complied fully with the requirements of 18 U.S.C. § 2518(1)(c) as interpreted by decisions of this court, and that it was proper for the district court judge to issue the order authorizing the wiretap on Bailey's business telephone. Accordingly, the trial court committed no er-

ror in denying the motion to suppress the evidence derived from the wiretap.

## III. SUFFICIENCY OF THE EVIDENCE—MOSS

Moss contends that the evidence was insufficient to sustain his conviction of conspiracy to distribute and to possess with intent to distribute heroin and cocaine.[12] Moss argues that although the intercepted telephone conversations [13] evidenced a close relationship between Bailey and Moss, and at most, established that Moss was a purchaser of narcotics, the evidence was insufficient to establish that he was a member of a conspiracy.[14]

 The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is whether, after "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* —— U.S. ——, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). Conspiracy is established "when there is an agreement to accomplish an illegal objective, coupled with one or more overt acts in furtherance of the illegal purpose and the requisite intent necessary to commit the underlying substantive offense." *United States v. Friedman,* 593 F.2d 109, 115 (9th Cir. 1979). Once the existence of a conspiracy is established, "evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the *connection is slight,* is sufficient to convict him with knowing participation in the conspiracy." *United States v. Dunn,* 564 F.2d 348, 357 (9th Cir. 1977). (emphasis in original).

In this case, there is ample evidence involving Bailey, Whitney and others to support the finding of a conspiracy to distribute narcotics. To prove participation by Moss in the over-all conspiracy, however, the prosecution was required to show that Moss agreed to effectuate the conspiracy's central criminal design, the distribution of heroin and cocaine in the Seattle area. *Daily v. United States,* 282 F.2d 818, 820 (9th Cir. 1960). The government must establish that Moss knew the purpose of the conspiracy and that he knew or had reason to know that others were involved and that his own benefits from his dealings with Bailey were probably dependent upon the success of the entire venture. *United States v. Thomas,* 586 F.2d 123, 132 (9th Cir. 1978); *U. S. v. Kearney,* 560 F.2d 1358, 1362

---

**12.** Count I of the amended Third Superceding Indictment provided as follows:

Beginning at a time unknown to the Grand Jury, but no later than on or about April 1, 1976, and continuing through on or about September 9, 1977, within the Western District of Washington, OTHA C. BAILEY, SR., JIMMIE LEE WHITNEY, BONNIE FAYE WILLIAMS, ROBERT L. KING, MARILYN WILLIAMS, THEODIOUS DANIELS, HOWARD BIBLE, and MAJOR MOSS knowingly did conspire to violate Title 21, United States Code, Section 841(a) by distributing and possessing with intent to distribute heroin, a Schedule I controlled substance under Title 21, United States Code, Section 812, and cocaine, a Schedule II controlled substance under Title 21, United States Code, Section 812.

All in violation of Title 21, United States Code, Section 846.

**13.** The government conceded at oral argument that the telephone conversations constituted the only evidence against Moss.

**14.** The trial judge gave the following instruction to the jury regarding membership in the conspiracy:

If you find beyond a reasonable doubt that the conspiracy described in Count I did in fact exist between at least two of the defendants, then you must determine which, if any, of the other defendants were members of that conspiracy.

A conspiracy may vary in its membership from time to time and may include two or more separate agreements among its members provided that the participants in the separate agreements are joined together by their knowledge of the essential features and scope of the overall conspiracy and by their common goal. Where the participants in separate agreements are not so joined, they are not members of a single, overall conspiracy, even though the separate agreements may have participants in common and may have similar goals.

*If you find that a particular defendant may have been a member of another conspiracy but was not a member of the conspiracy described in Count I then you must acquit that defendant of the crime charged in Count I.* (emphasis added) Instruction No. 8, C.T. 595.

(9th Cir.), *cert. denied* 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed.2d 460 (1977); *U. S. v. Baxter*, 492 F.2d 150, 158 (9th Cir. 1973), *cert. denied* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974).

The evidence against Moss consisted, in its entirety, of twenty-three tape-recorded telephone conversations. Moss dealt only with Bailey, and there is insufficient evidence to link him to any of the other alleged conspirators, with the possible exception of Bonnie Williams. Bailey made personal deliveries to Moss. Although Moss talked to Bonnie Williams on several occasions, he conducted no business with her and always asked to speak directly with Bailey. From the context of his conversations with Bailey, it is apparent that Bailey and Moss were friends. In addition, it appears that Moss purchased narcotics from Bailey in amounts which may have been more than for his own personal use.[15] Nevertheless, there is not enough in his conversations with Williams or Bailey to infer that Moss was aware of the existence of an over-all conspiracy involving others.[16]

The reference to "Dun-Rite," one of Daniels' dry-cleaning establishments, in the September 1, 1977 conversation between Moss and Williams about Bailey's appointment with Moss [17] is insufficient to show that Moss knew of the involvement of Daniels in the Bailey distribution organization. Not only was the reference to "Dun-Rite" made by Williams rather than Moss, but there was also evidence showing that Bailey's transfer business had been employed to move dry-cleaning equipment from Nu Way to Dun-Rite.[18] Even if it could have been shown through an additional reference made by Moss to "Danny" that Moss knew of Daniels' role as "the stash" for Bailey,[19] there is no evidence that Moss knew or had reason to know of other retailers or of Bailey's suppliers, or of any other purchasers.

**15.** On August 18, 1977 at 10:03 a. m., Moss called Bailey and said in relevant part, ". . . let me hear from you or something, uh, you know I need you this morning." Bailey responded, "Yeah . . . The same thing. . . [L]ater on." At 1:03 p. m. the same day Bailey asked Moss, "What kind of change you got?" Moss answered, "About 23 dollars." At 10:02 p. m. that evening Moss called Seafair and when Bonnie Williams answered, he asked to speak to Bailey. Bailey said, "Got news for you, boy." Moss said, "Yeah, well, I sure want to hear it, dope, yeah, yeah, lordy." R.T. 1387–1397.

**16.** On September 1, 1977 at 11:50 a. m., Moss called Bailey and said, ". . . that old thing that I was telling you about, I mean, it might mature this evening, you understand, have you, uh, uh, got any, uh, think you can cut me up some?" Bailey: "Hm, hm-huh." Moss: "Yeah, well, why don't you, uh, do me some, you understand, when you come up here cause I supposed to be in contact by 2:30." R.T. 1517. At 2:48 p. m. the same day, Moss called Seafair and asked for Bailey when Bonnie Williams answered. Williams responded that Bailey was not there. The conversation continued as follows. R.T. 1518.

> Moss: I never seen a man don't even take care of real important business (inaudible). I made it so plain to him. I said well man, I need you by 2:30.
> Williams: Well, didn't, didn't he come up there?

> Moss: He come up to the place but he ain't been here.
> Williams: Up to the house?
> Moss: Yeah, that's where I left word that I'm at the house.
> Williams: Uh-huh.
>
> . . . . .
>
> Williams: He had to make a run out to Dun Rite.
> Moss: Yeah, well, I know but I mean he done had plenty of time for that.

At 3:06 p. m. the same day, Bailey called Moss. R.T. 1521.

> . . . . .
>
> Bailey: What's cooking?
> Moss: Hey man, I mean, I just, uh, received a call, it could be in most any minute, any minute.
> Bailey: Yeah.
> Moss: Less than seconds, I mean, did you, uh
>
> . . .
>
> Bailey: Yeah, I be over.
> Moss: Yeah, uh, come straight on, please.
> Bailey: Good-Bye.
> Moss: Bye.

**17.** R.T. 1521.

**18.** R.T. 2195–2200.

**19.** In a call made on August 23, 1977 at 5:38 p.m., Moss called Bailey at Seafair and after talking about his telephone bill, Moss said ". . . I got about 23, 24 dollars or some-

Although it need not be shown that an alleged co-conspirator knew all of the purposes of and participants in a conspiracy, the government is required to prove that he knew he was plotting in concert with others to violate the law. *United States v. Kearney, supra* at 1362. In this case, the telephone conversations proved merely that Moss was a purchaser of narcotics from Bailey. Contrary to the government's contention that it is enough to show that Moss was a purchaser, proof of the conspiracy count requires that Moss be connected directly or circumstantially with a larger over-all scheme to distribute narcotics. *See Daily v. United States, supra.*

As has been noted, there is a tendency in conspiracy cases for the jury to believe that a defendant must have been involved in the alleged over-all conspiracy once it finds that the defendant committed one of the minor acts which the prosecution contends is but an extension of the greater conspiracy. *See United States v. Eubanks,* 591 F.2d 513, 523 (9th Cir. 1979, Ely, J., concurring). In this case, Moss was forced to defend himself at a joint trial lasting nearly three weeks with numerous other alleged co-conspirators. Guilt remains individual and personal, however, even in conspiracy prosecutions, and a conviction must rest upon individual guilt beyond a reasonable doubt, not mass guilt. *Kotteakos v. United States,* 328 U.S. 750, 772, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). We conclude that the government failed to prove that Moss was a knowing participant in the conspiracy charged, and accordingly, his conviction on the conspiracy count must be reversed.

In addition to the conspiracy count, Moss was convicted of eleven of sixteen charged communication counts.[20] In all of the communication counts charged against Moss, the underlying felony [21] facilitated by use of the telephone was facilitation of a conspiracy to distribute and to possess with intent to distribute heroin and cocaine. Accordingly, the communication count convictions must also fail for lack of sufficient evidence against Moss.

The judgments of conviction of Bailey and Whitney are affirmed. The judgment of conviction of Moss is reversed.

---

thing I got there but look like I'm gonna have to spend it. . . . So if you get Danny, well, let's go." Bailey: "Um-huh." Moss: "I'll be here." R.T. 1451–1455. The jury found Moss not guilty of the communication count based on this telephone conversation.

**20.** Moss was sentenced on March 13, 1978 to two years with a special parole term of six years on the conspiracy count, with his one-year sentence on ten of the communication counts to run concurrently with each other and with the conspiracy count. At oral argument, counsel for Moss stated that Moss had been in

custody pending the outcome of his appeal, and is now out on parole.

**21.** 21 U.S.C. Section 843(b) provides in part as follows:

It shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony . . . Each separate use of a communication facility shall be a separate offense . . . .