219 F.3d 1117 (9th Cir. 2000)
 UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
DANIEL RAY BENNETT, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
EDWARD STANLEY, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
VICTOR MANUEL MURILLO, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
MONICA RENEE GANT, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
KIMBERLY HARRIS, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
RICHARD WASHINGTON, Defendant-Appellant.
 Nos. 97-50605, 98-50002, 98-50070, 98-50209, 98-50212, 98-50514
 
 Office of the Circuit Executive
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted December 6, 1999--Pasadena, California
Filed July 28, 2000
 [Copyrighted Material Omitted]
 Michael D. Abzug, Los Angeles, California, David Z. Chesnoff, Las Vegas, Nevada, Ralph Bencangey, Beverly Hills, California, Diane E. Berley, West Hills, California, and Richard P. Lasting, for the defendants-appellants.
 Steven G. Wolfe, AUSA, Los Angeles, California, for the plaintiff-appellee.
 Appeals from the United States District Court for the Central District of California,Edward Rafeedie, District Judge, Presiding; D.C. Nos. CR-96-01140-ER-03, CR-96-01140-ER-01, CR-96-01140-ER-06,
 CR-96-01140-ER-10, CR-96-01140-ER-5, CR-96-01140-ER-12
 Before: Betty B. Fletcher, Alex Kozinski, and David R. Thompson, Circuit Judges.
 THOMPSON, Circuit Judge:
 
 
 1
 These consolidated appeals of defendants/appellants Daniel Ray Bennett, Edward Stanley, Victor Murillo, Kim Harris, Monica Renee Gant, and Richard Washington involve convictions resulting from an investigation of Stanley's drug organization, headquartered in Los Angeles, California. Bennett and Stanley entered conditional guilty pleas to conspiracy to commit interstate murder-for-hire resulting in death, in violation of 18 U.S.C. S 1958. Murillo and Harris entered conditional guilty pleas to possession with intent to distribute cocaine, in violation of 21 U.S.C. S 841(a)(1). Gant entered a conditional guilty plea to conspiracy to possess with intent to distribute heroin and cocaine, in violation of 21 U.S.C. S 846, and a jury convicted Washington of that same count[1].
 
 
 2
 All of the appellants challenge the district court's denial of their motion to suppress wiretap evidence.[2] They allege that, in its wiretap application for the drug conspiracy investigation, the government failed to show necessity, failed to provide a separate necessity showing for its murder-for-hire investigation, provided an incomplete periodic wiretap report to the court, and failed to minimize the interception of innocent telephone calls. They also challenge the district court's denial of a Franks hearing. See Franks v. Delaware, 438 U.S. 154 (1978). Harris also appeals the district court's determination that she lacked standing to challenge the legality of the wiretaps. Finally, Gant's attorney has filed a brief pursuant to Anders v. California, 386 U.S. 738 (1967), and moves to withdraw as counsel, asserting a failure to discover any arguable issues for appeal. We have jurisdiction pursuant to 28 U.S.C. S 1291. We affirm the district court's denial of the motion to suppress evidence from the wiretaps and the court's denial of the requested Franks hearing. We do not reach Harris's standing argument. We grant Gant's attorney's motion to withdraw.
 
 I. Facts
 
 3
 The government's undercover investigation of the Stanley drug organization began in 1996. In that investigation, law enforcement officials used confidential informants and an undercover officer. They also conducted physical surveillance of Stanley, installed pen registers on two telephone lines, analyzed toll records, and monitored hand-to-hand drug sales by Stanley. Despite information gained using these methods of investigation, the agents were unable to determine the full scope of the drug-trafficking conspiracy. They lacked knowledge of Stanley's drug suppliers and major customers.
 
 
 4
 On October 1, 1996, the government applied for and obtained a court order authorizing wiretap surveillance of two telephone lines for 30 days. FBI Special Agent Ronald Twersky ("Agent Twersky") filed affidavits in support of the wiretaps; the district court authorized them and twice extended their length.
 
 
 5
 Missing from the affidavits were details about a key government informant, Andrew Chambers. Although Agent Twerskydetailed the role Chambers played in the investigation, he failed to mention pertinent impeachment material. Chambers's checkered history included in part: lying under oath in previous cases, lying to federal agents about his prior arrest history, and failing to pay income taxes. Several federal circuit courts have documented Chambers's questionable credibility in unpublished and published opinions. See, e.g., United States v. Duke, 50 F.3d 571, 578 (8th Cir. 1995) ("The record, however, clearly demonstrates that Chambers did in fact perjure himself . . . when he testified that he had never been arrested or convicted.").
 
 II. Analysis
 A. Necessity
 
 6
 To establish that a wiretap is necessary, the application for the tap must provide "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."[3] 18 U.S.C. S 2518(1)(c). The issuing judge must then determine whether "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." Id. S 2518(3)(c). This necessity requirement "exists in order to limit the use of wiretaps, which are highly intrusive." United States v. Commito, 918 F.2d 95, 98 (9th Cir. 1990). We review for abuse of discretion an issuing judge's decision that a wiretap was necessary. See United States v. Brone, 792 F.2d 1504, 1506 (9th Cir. 1986).
 
 1. The Drug Conspiracy Investigation
 
 7
 Law enforcement officials tried to penetrate the Stanley drug conspiracy using an undercover agent, confidential informants, videotapes, pen registers, toll records, trap and trace devices, TRW credit reports, and physical surveillance. They amassed information implicating Stanley in drug distribution. They also learned of the existence of the ongoing drug conspiracy of which Stanley served as the leader. They were unable, however, to obtain information about the extended organization, such as other members, couriers, buyers, and suppliers.
 
 
 8
 The most successful informant, Chambers, tried to infiltrate the organization. He made contact with Stanley, and on several occasions law enforcement officials monitored his purchase of drugs from Stanley. Chambers's relationship with Stanley as a drug customer, and not as an involved member of the drug-trafficking organization, however, limited the amount of inside information he could obtain. He was able to buy drugs from Stanley, but Stanley did not disclose his source of supply nor did he identify other members of his organization.
 
 
 9
 Agent Twersky interviewed a second informant who agreed to provide information about the Stanley organization in exchange for a reduced prison sentence he was serving. This informant's incarceration, however, prevented him from participating in the investigation. Agent Twersky's third informant attempted but failed to engage Stanley in drug-related conversations. The fourth informant was too afraid to testify. Finally, Agent Twersky debriefed investigators from the police department and the Drug Enforcement Administration ("DEA") in Las Vegas. In particular, Agent Twersky interviewed an undercover officer who infiltrated the Stanley organization for a brief period in 1993, but that officer's interaction with Stanley ended abruptly after about one week.
 
 
 10
 The other conventional investigative techniques--physical surveillance, telephonerecords, and TRW credit reports--did not reveal the details of Stanley's transactions. See United States v. Brown, 761 F.2d 1272, 1276 (9th Cir. 1985) (stating that "telephone records, though raising the suspicion that illegal activity was occurring, failed to identify specific users or reveal the substance of the conversations"); Brone, 792 F.2d at 1506 (stating that "pen registers and toll records did not disclose the nature of the business being transacted by telephone").
 
 
 11
 Law enforcement officials had other investigative tools available to them, but Agent Twersky explained in his affidavit why they were not useful in the investigation. Agent Twersky detailed how the use of suspect interviews and grand jury subpoenas, to be productive, would necessarily involve granting immunity to the most culpable individuals in the conspiracy. Suspect interviews, grand jury subpoenas, and search warrants would also alert the suspects to the ongoing investigation. See Torres, 908 F.2d at 1422; Brown, 761 F.2d at 1276 (noting that "[m]ass search warrants or interviews would more likely have compromised the investigation rather than promoted it"). Twersky also explained that installation of closed-circuit television would risk detection and not provide specific information. Wiretaps, therefore, were necessary.
 
 
 12
 The appellants dispute that the wiretaps were necessary. They point to the degree of success the government had achieved using traditional investigative methods, and they argue the continued use of those and other such methods would have sufficed -or at least should have been given a chance to succeed. They also challenge any reliance on statements attributed to the confidential informant, Chambers.
 
 
 13
 A judge must "determine that ordinary investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time. " United States v. Spagnuolo, 549 F.2d 705, 711 (9th Cir. 1977). However, "the government need not exhaust every conceivable investigative technique in order to show necessity. " Torres, 908 F.2d at 1422. "[T]he necessity requirement is . . . to be interpreted in a practical and commonsense fashion .. . ." United States v. Bailey, 607 F.2d 237, 241 (9th Cir. 1979). We have consistently held that the wiretap statute does not mandate the indiscriminate pursuit to the bitter end of every non-electronic device as to every telephone and principal in question to a point where the investigation becomes redundant or impractical or the subjects may be alerted and the entire investigation aborted by unreasonable insistence upon forlorn hope.
 
 
 14
 United States v. Baker, 589 F.2d 1008, 1013 (9th Cir. 1979).
 
 
 15
 Thus, the mere attainment of some degree of success during law enforcement's use of traditional investigative methods does not alone serve to extinguish the need for a wiretap. See Bailey, 607 F.2d at 242 (noting that "the need for the wiretap arose when investigators, notwithstanding some success, had been unable, after six months of intensive effort, to learn of the full extent of the operation"); see also Torres, 908 F.2d at 1422.
 
 
 16
 Appellants contend that the informant Chambers's ability and willingness to participate in the investigation indicates that further use of this traditional technique could have been productive and nullifies the government's plea of necessity. We disagree. Chambers was able to buy drugs from Stanley, but he was unable to penetrate the Stanley organization. This is similar to the situation in Brone, 792 F.2d at 1504. There, we held that the government showed sufficient necessity despite an undercover agent "whose cover was apparently so believable that she was able to make several direct purchases of" drugs. Id. at 1505. Like the agent in Brone, Chambers successfully bought drugs but was unable to identify the drug suppliers. Unlike the agent's credibility in Brone, however, Chambers's credibility as a paid government informant would beunder attack and would therefore require further corroborating evidence. See United States v. Kelley, 140 F.3d 596, 605 (5th Cir. 1998) (reasoning that paid informants necessitate further corroboration because the government knows that the informant would be subject to impeachment).
 
 
 17
 We conclude that the government satisfied the necessity requirement.
 
 2. The Murder-For-Hire Investigation
 
 18
 In the course of monitoring the wiretaps set up to investigate the drug conspiracy, law enforcement officials learned about a murder-for-hire plot in which Stanley hired Bennett to murder a person suspected of stealing drug proceeds from the Stanley organization. Stanley's reason for hiring Bennett to do the killing was interwoven with Stanley's drug operation. Therefore, the wiretap authorization was sufficient to encompass the murder-for-hire plot. See United States v. Petti, 973 F.2d 1441, 1446 (9th Cir. 1992) (holding that facts justifying a wiretap application for uncovering a gambling operation justified the government's shift to investigating a money laundering scheme using the same wiretap). As a result, no further showing of necessity for the murder-for-hire investigation was required; it was part and parcel of the larger drug conspiracy investigation. See United States v. Homick, 964 F.2d 899, 904 (9th Cir. 1992).
 
 B. Ten Day Report
 
 19
 The appellants contend that intercepted conversations after November 14, 1996 relating to the murder-for-hire plot should be suppressed because the government misled the issuing judge about its progress in that investigation. Intercepted murder-for-hire phone conversations were reported to the issuing judge in a Ten Day Report on November 14, 1996, without mentioning that the government had allegedly identified the victim and planned to warn him.
 
 
 20
 On November 10, law enforcement agents believed that Percy Bacon was the target in the murder-for-hire plot, but they "were unsure at [that] time." On November 13, a DEA report stated that law enforcement agents intended to warn Bacon because they "believed that a murder contract had been placed on" him. The next day, the government's Ten Day Report to the issuing judge informed the court about two telephone calls in which Bennett discussed the murder-for-hire plan, but that report did not disclose that the government had identified Bacon as the possible victim, nor did it mention the information in the DEA report. The government wrote in its Ten Day Report that the "intended victim had not yet been certainly identified."
 
 
 21
 Contrary to appellants' contention, the government did not mislead the issuing judge. A cautious decision to warn a possible victim does not imply that law enforcement officials knew with certainty the true identity of the intended victim. Indeed, the person the government warned, Bacon, turned out not to be the person who was killed. The Ten Day report was not misleading.
 
 C. Minimization
 
 22
 We review de novo whether law enforcement officials properly minimized the interception of nonrelevant phone conversations during the course of the wiretaps. See Torres, 908 F.2d at 1423. The wiretap statute
 
 
 23
 does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to `minimize' the interception of such conversations. Whether the agents have in fact conducted the wiretap in such a manner will depend on the facts and circumstances of each case.
 
 
 24
 Scott v. United States, 436 U.S. 128, 140 (1978).
 
 
 25
 The circumstances of the present case, including the number of nonrelevant recorded telephone calls, demonstrate that the government properly minimized the wiretap interceptions. The appellants contend law enforcement officials failed tominimize 267 calls--219 that are alleged to have been improperly intercepted and another forty-eight that were deleted. This number gains context when compared with the total number of intercepted calls: 7322. Moreover, the fortyeight deleted calls resulted from the telephone company improperly patching calls through. The evidence also supports the conclusion that many of the 219 calls were not improperly intercepted.
 
 
 26
 Even assuming the government improperly intercepted all 267 calls as the appellants assert, this was only 3.65% of the total number of calls intercepted. Such a percentage alone is not fatal. See Homick, 964 F.2d at 903 (noting that the interception of "even a relatively high percentage of nonpertinent calls is an inaccurate indicator of whether or not the government complied with the minimization requirement"). "Where, as here, the wire intercept concerns a drug ring, the need to allow latitude to monitoring agents is paramount. . . . The fact that the FBI overheard a few innocent conversations does not render its minimization efforts unreasonable." Torres, 908 F.2d at 1424 (citations omitted). In cases such as the present one involving "a wide-ranging conspiracy with a large number of participants, even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the calls before they were completed." Scott, 436 U.S. at 142. Moreover, if phone conversations include guarded or coded language as in this case, a higher rate of nonrelevant intercepted calls should be expected because it takes longer to figure out the meaning of a particular call. See id. at 140. We conclude that the interception of nonrelevant phone conversations were properly minimized.
 
 D. Franks Hearing
 
 27
 The appellants assert that Agent Twersky's omission of evidence impeaching Chambers's credibility from the wiretap application undermines the issuing judge's determination of probable cause and necessity for the wiretaps. See United States v. Ippolito, 774 F.2d 1482, 1485 (9th Cir. 1985) (applying a Franks analysis to necessity showings in wiretap applications). While we review de novo the district court's denial of a Franks hearing, see United States v. Meling, 47 F.3d 1546, 1553 (9th Cir. 1995), "[u]nderlying factual findings of the district court regarding materiality are reviewable under the clearly erroneous standard," Ippolito, 774 F.2d at 1484.
 
 
 28
 A defendant is entitled to a Franks hearing only if he makes a two-fold showing: intentional or reckless inclusion or omission, and materiality. A defendant satisfies this two-fold obligation by making "a substantial preliminary showing that `the affidavit contain[ed] intentionally or recklessly false statements, and . . . [that] the affidavit purged of its falsities would not be sufficient to support a finding of probable cause.' " Meling, 47 F.3d at 1553 (citation omitted) (extending this analysis to omissions as well as false statements). Here, the district court did not clearly err in determining that the appellants satisfied the recklessness requirement, but not the materiality requirement.
 
 
 29
 In his affidavit, Agent Twersky stated that Chambers had worked for the DEA as a confidential informant for over ten years. During that time, the DEA had paid him "more than $1,000,000 for [his] expenses and services in investigations." Missing from Chambers's DEA file and, consequently, Agent Twersky's affidavit, were the times that Chambers perjured himself, lied, had been arrested, and failed to pay income taxes. As we stated previously, several circuit court opinions mention Chambers by name and impugn his credibility.
 
 
 30
 The government concedes that it failed to include this information in its internal file on Chambers. It also concedes that this failure, which resulted in the omission of these matters from Agent Twersky's affidavit, must be deemed reckless. The government contends, however, that the omission was not material.
 
 
 31
 "Where the wiretap application presents substantial evidence supporting a finding of probable cause independent of the information provided by an informant, that showing will compensate for an informant's low credibility." Id. at 1555. Here, law enforcement officials tracked the drug exchanges between Chambers and Stanley by inventorying Chambers's possessions immediately before and after each meeting. They photographed, videotaped, and observed, to the extent possible, the persons with whom Chambers interacted and the movement of drugs and money. Law enforcement officials also debriefed Chambers and, by reviewing audio recordings and consensually monitored conversations, they independently verified that he accurately recounted the details of his drug transactions and meetings. See United States v. Jones, 801 F.2d 304, 313-14 (8th Cir. 1986) (stating that, even though the affidavit failed "to identify all prior bad acts of the informant," the informant's credibility "was demonstrated by consensually monitored conversations, chemical analysis, and extensive police monitoring").
 
 
 32
 Agent Twersky's assessment of necessity did not rest solely on the credibility of what Chambers told him. Twersky included in his affidavit information from independent physical surveillance, three other informants, and an undercover agent. The district court accurately recounted the minimal role Chambers's credibility played:
 
 
 33
 There was overwhelming evidence in the affidavit presented to [the issuing judge] corroborating the evidence obtained via [Chambers] to support a showing of probable cause to believe that Stanley was distributing illegal narcotics and using target telephones in his efforts to do so. This included contemporaneous visual, audio, video, and still photographic monitoring of [Chambers's] three drug transactions with Stanley, none of which evidence has been challenged by the defense, though it has long been available to the defense. [Chambers's] credibility was almost irrelevant to this documentary evidence, because he merely acted as a human conduit for the contemporaneous electronic monitoring of the three drug transactions with Stanley. Additionally, the finding of probable cause was also based upon testimony from [Confidential Informants] Nos. 2-4, and information from an undercover police officer in Las Vegas.
 
 
 34
 District Court Order filed Aug. 19, 1997, at 2-3.
 
 
 35
 We conclude that Agent Twersky's affidavit for the wiretap application contains information supporting probable cause and necessity independent of the information impeaching Chambers's credibility. Accordingly, although it was reckless not to include the adverse information about Chambers, the district court did not clearly err in determining that omission was not material to the determination of necessity for issuance of the wiretap authorization. See Meling, 43 F.3d at 1555.
 
 
 36
 The appellants contend, however, that aside from Chambers's lack of credibility, probable cause and necessity were not established, because Agent Twersky's credibility is itself called into question by his reliance on Chambers. Agent Twersky represented to the judge who issued the wiretap authorization that Stanley would not divulge to Chambers the names of Stanley's suppliers or other members of the drug conspiracy, and that Chambers was thus unable to penetrate the Stanley organization. This representation was based on Chambers's assessment of his interactions with Stanley. If Chambers lied about that, the appellants argue, Agent Twersky's representation lacks any foundation and the wiretap application is stripped of any showing of necessity or probable cause.
 
 
 37
 Again, however, we have independent reason to believe that Chambers's assessment was correct despite any doubts as to his credibility. Unlike the informant in Ippolito, 774 F.2d at 1486-87, who was the target's "right hand man, " Chambers's role was limited to hand-to-hand drug purchases. Given the drug organizations'ssecrecy, it was unlikely Stanley would divulge to a drug purchaser such as Chambers information pertaining to the members of the conspiracy.
 
 
 38
 Twersky's credibility is called into question anyway, say the appellants, because of an inconsistency in his affidavit. They point out that he acknowledged an undercover agent had in fact infiltrated the Stanley organization. This being so, they argue, the organization was penetrable and it was disingenuous for Twersky to say it was not. This argument lacks merit. The supposed inconsistency unravels once it is put in context. The undercover agent's success in infiltrating the organization lasted for roughly one week and terminated abruptly. The agent's aborted penetration of the organization only highlights the difficulties inherent in gaining access to the inner workings of the drug conspiracy.
 
 
 39
 The district court did not err in denying a Franks hearing.
 
 E. Harris's Standing
 
 40
 Although Harris attempted to join her codefendants' motion to suppress the wiretap evidence, the district court determined she lacked standing because she failed to file a declaration alleging her standing under the Central District of California's Local Criminal Rule 9.2. That rule requires the filing of a declaration "setting forth all facts then known and upon which it is contended the motion should be granted" and detailing admissible facts that "show affirmatively that the declarant is competent to testify to the matters stated therein." U.S. Dist. Ct. Rules C.D. Cal., Crim. R. 9.
 
 
 41
 Even if we were to conclude that Harris had standing to join in the suppression motion, we would not reverse the district court because we have affirmed the court's denial of the suppression motion on the merits.
 
 F. Gant's Appeal
 
 42
 Gant and a codefendant were drug couriers. They traveled from Los Angeles to Memphis in a car loaded with 24.13 kilograms of cocaine and then turned the car over to another codefendant. Gant entered a guilty plea, waiving her right to appeal her sentence but retaining her right to appeal the district court's denial of the appellants' motion to suppress the wiretap evidence. Gant's court-appointed appellate attorney has filed an Anders brief and now moves to withdraw. Gant has not filed a pro se supplemental brief.
 
 
 43
 In accordance with Anders v. California, 386 U.S. 738 (1967), Gant's attorney compiled excerpts of the record and briefed all possible legal issues so that we might independently assess Gant's appeal. Gant's counsel identified three possible issues for review: Gant's plea bargain, sentencing, and standing to join her codefendants' motion to suppress the wiretap evidence. If this court "finds any of the legal points arguable on their merits . . . it must . . . afford the indigent the assistance of counsel to argue the appeal." Id. at 744.
 
 
 44
 After an independent review of the record, and in view of our resolution of the suppression issue, we conclude there are no unresolved, nonfrivolous issues in Gant's appeal. See Penson v. Ohio, 488 U.S. 75, 83 (1988) (requiring an independent review of the record). Gant was competent to enter a guilty plea, and she did so knowingly and voluntarily. See Fed. R. Crim. P. 11. Even assuming that the district court abused its discretion by denying Gant standing to participate in the motion to suppress the wiretap evidence, we have affirmed the district court's denial of that motion on the merits.
 
 CONCLUSION
 
 45
 For the reasons discussed above, we AFFIRM the district court and grant Gant's attorney's motion to withdraw.
 
 
 46
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Washington appeals the district court's denial of his motion for judgment of acquittal. He contends the evidence against him was insufficient for the jury to find him guilty beyond a reasonable doubt. In a separate, unpublished disposition filed concurrently with this opinion, we affirm the district court's denial of Washington's motion for judgment of acquittal.
 
 
 [2]
 Bennett and Stanley filed a motion to suppress the wiretap evidence and the other appellants joined in that motion.
 
 
 [3]
 Appellants contend Agent Twersky's statement that the wiretaps were needed to discover the "full scope" of the conspiracy falls victim to the specificity requirement in 18 U.S.C. S 2518(1)(c). We disagree. We have consistently upheld similar wiretap applications seeking to discover major buyers, suppliers, and conspiracy members. See United States v. Torres, 908 F.2d 1417, 1422 (9th Cir. 1990).