**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Joseph MELING, Defendant–Appellant.**

**No. 93–30238.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 3, 1994.

Decided Feb. 22, 1995.

Cyrus R. Vance, Jr., Culp, Guterson & Grader, Seattle, WA, for defendant-appellant.

Joanne Y. Maida, Asst. U.S. Atty., Seattle, WA, for plaintiff-appellee.

Before: WRIGHT, KOZINSKI and FERNANDEZ, Circuit Judges.

KOZINSKI, Circuit Judge.

In 1990, Joseph Meling took out several hundred thousand dollars in life insurance on his wife; in early 1991, he added accidental death benefits. All told, Meling stood to collect $700,000 if his wife happened to die in an accident. Meling was not just being prudent; he was planning for the future.

Meling, however, wasn't satisfied to leave such important matters to chance: The day after the coverage became effective, he fed his wife a capsule of cyanide-laced Sudafed. Miraculously, she survived, but Meling's amateur pharmacology continued. Worried he might be suspected in the poisoning, Meling concocted a scheme to divert official attention elsewhere. What better place to hide a tree than in the forest? So Meling laced five packages of Sudafed with lethal amounts of cyanide and planted them on drug store shelves, killing two people before Burroughs–Wellcome could institute a national recall of its product.

This macabre scheme wasn't Meling's only attempt to divert suspicion. First, he played the dutifully distraught husband: When his wife collapsed from the poison, Meling

phoned 911 and feigned hysteria, then melodramatically vowed to the paramedic who arrived on the scene that he would beat the ambulance to the hospital. Then he bluffed: While his wife lay hospitalized, he called the police into her room and declared in front of her family that he expected to be the prime suspect because of the insurance he had purchased. And finally, he lied: He claimed that this suspicion would prove unwarranted because the policies he bought did not cover death by poisoning.

Though less twisted than poisoning innocent people to divert suspicion, these ruses likewise failed. Meling's performance as the distraught husband was wooden, and both the 911 operator and the paramedics suspected Meling was feigning grief. Meling also raised eyebrows among the hospital staff with his odd behavior: He declined what might have been his last opportunity to see his wife alive, and stunned the doctors treating his wife by suggesting that they should look for signs of cyanide poisoning. Until that point, the doctors had been flummoxed by his wife's symptoms.

The FBI easily verified that the policies Meling had purchased did not preclude coverage for poisoning—a fact Meling no doubt knew, not only because he was an insurance salesman, but also because he had asked a colleague if an accidental death policy would cover death by poisoning. Interviewing Meling's wife after her recovery, the FBI discovered other disturbing evidence of Meling's guilt: Meling behaved bizarrely in the months leading up to the poisoning, and coaxed his wife into taking the laced Sudafed by complaining that she was congested and snored at night; before being poisoned, Meling's wife had, in fact, been perfectly healthy.

Meling was thus the central focus of the investigation from the outset. He had the motive and the opportunity to poison his wife, and he had the motive and opportunity to commit the other tamperings. But Meling stymied the FBI in its efforts to build a case. He instructed his family not to cooperate in the investigation and enforced that instruction with threats. And he wheedled his way back into his wife's affections, cajoling her into recanting her prior statements about his behavior and encouraging her to withhold information from the investigating authorities.

Stonewalled in its pursuit of more rudimentary methods of investigation, the FBI obtained authorization for a wiretap on the Melings' phone. When the original wiretap expired, the FBI sought and obtained an extension. And when it became clear that the Melings suspected the phone was tapped, the FBI obtained an order permitting it to install listening devices in the walls of the Melings' home. This surveillance did not lead to the admission of guilt that the FBI coveted, but it did lead to evidence that was instrumental in securing Meling's conviction, including the discovery of the store where Meling had bought the cyanide.

At trial, the government presented circumstantial evidence of Meling's guilt, including his feigned grief, lack of emotion in the face of his wife's suffering, attempts to obstruct the investigation, and motive and opportunity to commit the crime. The government also presented two handwriting experts who testified that Meling had forged a signature on a poison register, linking him to the purchase of a pound of sodium cyanide scant weeks before the poisonings. Meling was convicted of six counts of product tampering: One count for causing serious bodily injury to his wife, 18 U.S.C. § 1365(a)(3); two counts for causing the deaths, *id.* § 1365(a)(2); and three counts for planting the packages of laced Sudafed that were recovered unopened, *id.* § 1365(a)(4). The district court sentenced Meling to life in prison.

On appeal, Meling raises four issues. He claims that the government obtained authorization for the wiretaps without establishing probable cause; that the district court improperly denied him a *Franks* hearing to challenge the veracity of the information provided in the wiretap applications; that multiple trial errors and prosecutorial misconduct deprived him of a fair trial; and that his life sentence is excessive.

## A. Probable Cause

A district judge authorizing a wiretap must enter several statutorily-required

findings of probable cause. The judge must find probable cause to believe (1) that an individual is committing, has committed, or is about to commit specified offenses, including product tampering and obstruction of justice, 18 U.S.C. § 2518(3)(a); (2) that communications relevant to that offense will be intercepted through the wiretap, *id.* § 2518(3)(b); and (3) that the individual who is the focus of the wiretap investigation will use the tapped phone, *id.* § 2518(3)(d).[1] Looking only to the four corners of the wiretap application, we will uphold the wiretap if there is a "substantial basis" for these findings of probable cause. *United States v. Stanert,* 762 F.2d 775, 778–79 (9th Cir.), *amended,* 769 F.2d 1410 (9th Cir.1985); *United States v. Brown,* 761 F.2d 1272, 1275 (9th Cir.1985); *see also Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983).

The FBI supported the first wiretap application with the affidavit of one of its agents. This affidavit recounted the substantial circumstantial evidence of Meling's guilt and his attempts to obstruct the investigation: Meling obtained $700,000 in life insurance on his wife shortly before the poisoning; he behaved bizarrely in coaxing his wife to take the laced Sudafed; and, after the poisoning, he ineptly feigned grief, downplayed to the police the extent of insurance coverage he had obtained, and intimidated his family into withholding information.

The wiretap affidavit also provided information from and about a cooperating witness, Keith Meling. Keith is defendant Joseph Meling's uncle, and he came forward despite threats of retaliation from his family. Among other things, he told the FBI that Joseph had spoken to him on several occasions about wanting to get rid of his wife and described a recent telephone conversation in which Joseph admitted the poisonings. The affidavit also explained that Joseph had moved into his parents' home—a fact the FBI had independently learned—and was using their phone, which then became the target of the wiretap.

 The affidavit supporting the original application therefore addressed each of the three statutory requirements: It provided evidence that Joseph Meling had committed the poisoning and was obstructing the investigation; it indicated that Meling had used the phone to talk about these crimes with his uncle; and it showed that Meling had moved into his parents' home and was using the target telephone. That information gave the district judge reviewing the wiretap application "a substantial basis for concluding that the affidavit in support of the [wiretap application] established probable cause." *United States v. Angulo–Lopez,* 791 F.2d 1394, 1396 (9th Cir.1986).

 The two applications for extensions of the wiretap also provided a substantial basis for finding probable cause. These applications incorporated the first one, and supplemented the original showing of probable cause with transcripts of seized conversations. These conversations reveal Meling's efforts to worm his way back into his wife's good graces and to convince her not to cooperate in the FBI's investigation. Coupled with the original application, this information provided a substantial basis for the reviewing judge's finding of probable cause.

Meling argues, however, that by the time of the second application the FBI no longer had probable cause to believe that a wiretap would seize relevant conversations, because on several occasions Meling and his family made comments directed at the FBI agents they presumed were eavesdropping. But the fact that the Melings might have suspected the phone was tapped does not mean the wiretap was certain to fail. Suspicion is not the same as certainty; individuals who merely suspect they are under surveillance may get careless and utter incriminating statements. So it was here: Even as they were voicing suspicion that the phones might be tapped, the Melings were engaging in conversations that were relevant to the investigation.

---

1. Meling only challenges the government's showing with respect to probable cause. Therefore, we assume the government made a sufficient showing of necessity for the wiretap under 18 U.S.C. § 2518(3)(c).

## B. *Franks* Issues

Meling attacks this facially sufficient showing of probable cause by claiming that the FBI intentionally omitted and falsified information in its wiretap applications. The original application failed to disclose several facts that undermine the credibility of the FBI's principal informant, Keith Meling. First, Keith Meling had been convicted of forgery and fraud three times, and though each of these convictions was over ten years old, he had a panoply of parole violations for similar offenses stretching back to his first conviction. Second, though the FBI rap sheet did not reflect it, Keith Meling had been convicted of a felony in 1990, just one year before the wiretap application, and had been committed to a mental institution, where he experienced auditory and visual hallucinations and was diagnosed as having schizophrenia. Finally, the affidavit supporting the wiretap application failed to mention that Keith Meling came forward at least in part to obtain the $100,000 reward offered for information relating to the poisonings; to the contrary, the affidavit characterized Keith Meling's motives as pure. The FBI did not correct these misstatements and omissions in the extension applications.

■ Defendant claims that the district court should have held a hearing to determine whether the FBI deliberately misled the reviewing judge in the wiretap applications. A district court must suppress evidence seized pursuant to a wiretap if the defendant can show the wiretap application contained intentionally or recklessly false information that was material to the finding of probable cause. *See United States v. Leon,* 468 U.S. 897, 923, 104 S.Ct. 3405, 3420–21, 82 L.Ed.2d 677 (1984). A criminal defendant is entitled to a hearing to test the veracity of an affidavit supporting the application under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), if he can make a substantial preliminary showing that "the affidavit contain[ed] intentionally or recklessly false statements, and ... [that] the affidavit purged of its falsities would not be sufficient to support a finding of probable cause." *United States v. Lefkowitz,* 618 F.2d 1313, 1317 (9th Cir.1980). *Franks* applies to omissions as well as false statements. *Stanert,* 762 F.2d at 781. We review de novo the district court's denial of a *Franks* hearing. *United States v. Ippolito,* 774 F.2d 1482, 1484 (9th Cir.1985).

■ We focus here on three omitted pieces of information: (1) the old convictions for forgery and fraud and the attendant parole violations, (2) the recent conviction, and (3) the history of mental illness. We also consider one falsity: the characterization of Keith Meling's motives as pure. In determining whether defendant should have been given a hearing on his *Franks* claims, we engage in a two-part inquiry. First, we must ask whether the FBI intentionally falsified, or recklessly failed to verify, any of the information in the application. If defendant has made a substantial showing that the FBI falsified the applications, we proceed to determine whether the falsities are material: We will remand for a *Franks* hearing if the applications, purged of their intentional or reckless falsities, would not support a finding of probable cause.

### 1. *Intentional or Reckless Omissions*

■ Defendant has made a substantial showing that the FBI knew about Keith Meling's older convictions and parole violations at the time of the original wiretap application. The FBI was also aware of the $100,000 reward (it was public knowledge), and it knew Keith Meling had come forward at least in part in the hope of getting the reward money. The FBI thus misled the reviewing judge when it omitted this information from the wiretap application, and when it characterized Keith Meling's motives as entirely pure.

■ Defendant has not, however, made a substantial showing that the FBI intentionally or recklessly omitted Keith Meling's 1990 conviction or his history of mental illness from the original wiretap application. As proof that the FBI actually knew of this information, defendant offers nothing more than his own speculation regarding the timing of the FBI's focus on Keith Meling as a suspect in the tamperings. He contends that the FBI suspected Keith Meling of partici-

pating in the poisonings from the outset of the investigation, but the FBI indicated that Keith Meling did not become a suspect until after the wiretap became operational, when he asked an FBI agent what would happen to him if it turned out he had bought the cyanide. It was only then that the FBI conducted a more thorough investigation into Keith Meling's background and discovered the recent conviction and the history of mental illness. For whatever reason, this information was not contained in the FBI's rap sheet. Defendant disbelieves the FBI, but that disbelief does not amount to the substantial showing required under *Franks.*

Nor has Meling made a substantial showing that the FBI was reckless in failing to discover this information before submitting the original application. Defendant argues that Keith Meling's mental history and 1990 conviction were reflected in records available at the county records office, and that the FBI should have searched for these records. But the FBI relied on its rap sheet to provide up-to-date information on Keith Meling's criminal history, and until Keith Meling became a suspect the FBI had no reason to conduct a more thorough background check. Its failure to do so fell far short of reckless disregard of the truth. *See United States v. Miller,* 753 F.2d 1475, 1478 (9th Cir.1985) ("It might have been prudent for the federal agents to check on [an informant's] background and criminal record, but their failure to do so is not reckless disregard.").

■ The FBI's knowledge did grow, however, over the course of the investigation and FBI agents had discovered Keith Meling's recent conviction and history of mental illness by the time the extension applications were filed. Yet they continued to rely on the original wiretap application, and in particular on the information provided by Keith Meling. They did so without specifically attributing the information to Keith Meling, and without apprising the reviewing judge of the new information they had gathered concerning Keith Meling's criminal history and mental illness. This silence is as troubling as it is unjustifiable. Keith Meling has spent the better part of his adult life involved with the criminal justice system, mostly for crimes

involving dishonesty. He has been involuntarily committed to a mental institution three times and diagnosed as having auditory and visual hallucinations. And he has a documented history of harming his family through dishonesty: One of his first felony convictions was for forging a check drawn on his father's bank account.

Meling has thus made a substantial showing that the FBI deliberately omitted information concerning Keith Meling's credibility from both the original and the extension applications. At the time of the original application, the FBI knew of Keith Meling's older convictions and the $100,000 reward, and by the time it filed the extension applications the FBI had knowledge of Keith Meling's more recent criminal conviction and history of mental illness. None of this information was disclosed, and the FBI continued to characterize Keith Meling's motives as pure when it knew he had come forward at least in part to obtain the reward money.

### 2. *Materiality*

Identifying intentional omissions and misstatements is not enough, however, to warrant a *Franks* hearing. Meling also has to show that these deceptions are material; that is, he has to show that the district judge could not have found probable cause supporting the wiretap had he been apprised of Keith Meling's prior convictions, history of mental illness, and potentially impure motive. *Stanert,* 762 F.2d at 782. "[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Franks,* 438 U.S. at 171–72, 98 S.Ct. at 2684. We must consider, therefore, whether the affidavits supporting the finding of probable cause, "once corrected and supplemented, would provide a [reviewing judge] with a substantial basis for concluding that probable cause existed." *Stanert,* 762 F.2d at 782.

■ In determining whether an affidavit is sufficient to establish probable cause, the reviewing judge looks to the totality of the circumstances: He must assess the credibility and basis of knowledge of any infor-

mants (though neither of these factors alone determines what weight should be given the informant's tips) and weigh any other information supporting a finding of probable cause. *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983). Where the wiretap application presents substantial evidence supporting a finding of probable cause independent of the information provided by an informant, that showing will compensate for an informant's low credibility. *See Miller,* 753 F.2d at 1480. We consider, in turn, whether the original and the extension applications provide probable cause for the wiretap once the FBI's dissembling is corrected.

### a. *Original Application*

▮▮▮▮ In the original application, the FBI deliberately failed to mention Keith Meling's potentially impure motive and his ten-year-old convictions for forgery and fraud. Including this information in the application would not completely undermine Keith Meling's credibility, and thus would not require that the information he provided be completely disregarded. The omitted convictions were stale, and even if Keith Meling had been motivated by the reward, that did not make him a liar. Informants often, if not usually, cooperate for money, and the fact that an informant has an ulterior or impure motive in coming forward to provide information to the police does not preclude a finding that the informant is nevertheless credible. *See, e.g., Massachusetts v. Upton,* 466 U.S. 727, 729, 104 S.Ct. 2085, 2086, 80 L.Ed.2d 721 (1984) (upholding finding of probable cause even though informant's motive is revenge). In fact, that's why rewards are offered and are often very effective.

Moreover, the applications provide some evidence that Keith Meling was a credible informant: He was providing information adverse to the interests of members of his own family; he came forward despite their threats of retaliation; and though the FBI could not corroborate the content of the conversations he recounted, it was established that they had in fact occurred. The wiretap application also firmly established the basis

of Keith Meling's knowledge about his nephew's crimes. Keith Meling was not only a member of the family, but he was also familiar with Meling's actions, and he described conversations in which Meling expressed a desire to kill his wife, admitted the attempt on her life, and admitted the other poisonings.

It is also significant that the untruths and omissions in the original applications relate entirely to Keith Meling's credibility; they do not undermine the other evidence presented by the FBI. In this regard, the original application contained considerable independent evidence pointing to Meling as the poisoner. Coupled with the interval between Mrs. Meling's poisoning and the appearance of other victims, this evidence provided the reviewing judge with a substantial basis for concluding that Meling had committed the other poisonings to cover up his original crime. Meling's wife had been poisoned on February 2, there had been another poisoning on February 11, and a third on February 18.

### b. *Extension Applications*

▮▮ The materiality of the information omitted from the extension applications turns on the same questions, though the mix of information is somewhat different. Unlike in the original application, where the FBI deliberately omitted only the aging convictions, the information intentionally left out of the extension application—Keith Meling's mental illness and his recent felony conviction—does not just reduce his credibility; it substantially eliminates it. In the extension applications as in the original, however, the FBI did not rely exclusively, or even primarily, on the information provided by Keith Meling. The bulk of the evidence supporting probable cause came from other sources, including the FBI's questioning of Meling's wife and other witnesses. Just as this information bolstered the original application, when repeated in the extension applications it provided a substantial basis for suspecting that Meling poisoned

his wife and that he tried to cover his tracks with the random poisonings.

The extension applications further supported this showing of probable cause with excerpts of conversations seized through the original wiretap. These excerpts show that Meling and members of his family were trying to derail the investigation by manipulating his wife and others into lying to, or withholding information from, the FBI. Significantly, Meling instructed his wife to get her written witness statements so that he could review them, and he strongly advised her not to speak with the Assistant United States Attorney in charge of the case. Meanwhile, his family discussed ways of withholding information from the FBI, and speculated about sending Meling to Canada to escape prosecution. These conversations document the family's attempt to obstruct the investigation, and show Meling's awareness of his guilt.

Given the total mix of information contained in each wiretap application, we cannot say that the various omissions and single misstatement Meling has identified preclude a finding of probable cause.[2] Each application provided substantial evidence that Meling committed the poisonings, and that he and his family were using the phone both to discuss the crime and to further their efforts to obstruct the investigation. In the extension applications, this showing was reinforced with excerpts of seized conversations. Even if Keith Meling's affidavit is omitted entirely, "there remains sufficient content in the [wiretap applications] to support a finding of probable cause." *Franks,* 438 U.S. at 172, 98 S.Ct. at 2684.

## C. Trial Errors and Prosecutorial Misconduct

Meling contends the district court erred in admitting the lay opinion testimony of the 911 operator and paramedic, both of whom testified that Meling was feigning his grief shortly after the poisonings. Meling also contends that the district court erred in admitting evidence of his bad character under

Fed.R.Evid. 404(b); specifically, Meling objects to evidence showing his threatening behavior toward his family, his purchase of an expensive firearm and his use of profanity. In addition, Meling identifies four instances of alleged prosecutorial misconduct: the prosecution's improper reliance on Meling's character flaws to bolster its case; its violation of a pretrial agreement on the introduction of evidence about striptease dancers' fear of Meling; its violation of a pretrial order limiting the introduction of evidence concerning Meling's firearm purchase; and its improper vouching for the credibility of a prosecution witness.

■■■■ Meling raised his evidentiary objections in a pretrial motion and at trial, and he raised the claim of prosecutorial misconduct in a motion for new trial. We review the district court's decision to admit evidence for abuse of discretion. *Unites States v. Simas,* 937 F.2d 459, 463 (9th Cir.1991); *United States v. Green,* 648 F.2d 587, 592 (9th Cir.1981). We also review for abuse of discretion the district court's denial of a motion for new trial based on prosecutorial misconduct. *See United States v. Yarbrough,* 852 F.2d 1522, 1538 (9th Cir.1988).

### 1. *Evidentiary Issues*

■■■■ The district court did not abuse its discretion in admitting the lay opinion testimony of the 911 operator and paramedic. Lay opinion testimony is admissible if it is "'rationally based on the perception of the witness' and ... helpful to the jury in acquiring a 'clear understanding of the witness' testimony or the determination of a fact in issue.'" *Simas,* 937 F.2d at 464 (quoting Fed.R.Evid. 701). Paramedics are trained to respond quickly in emergency situations, and while treating Meling's wife, the paramedic had ample time to form the impression that Meling was feigning grief. *See United States v. Jackson,* 688 F.2d 1121, 1125 (7th Cir.1982) ("The amount of time that the witness had to observe the defendant goes to the weight to be accorded to the testimony by the jury rather than to its admissibility.").

---

**2.** This conclusion should in no way commend similar practices to the FBI in the future. We understand the urgency the FBI agents felt as

they strove to prevent further poisonings. But this does not justify deliberate or reckless misrepresentations in wiretap applications.

The 911 operator's testimony was rationally based on her perception of Meling's agitation during his emergency call and, though a tape of the conversation was played in full, the jury was not in the same position as the 911 operator to compare Meling's behavior with that of other emergency callers or to assess whether it was abnormal. *Compare United States v. LaPierre*, 998 F.2d 1460, 1465 (9th Cir.1993) (witness who has no previous exposure to the defendant is no better situated than the jury to identify the defendant from a surveillance photograph) *with Jackson*, 688 F.2d at 1125 (eyewitness identification testimony is helpful to the jury, even if surveillance photographs are available, "because it is based upon [the eyewitness'] opportunity to compare the person in the bank surveillance photograph with every person she had ever met, whereas the jury could only compare the person in the surveillance photographs to the defendant").

▮▮▮ The district court also did not abuse its discretion in admitting evidence of Meling's character under Fed.R.Evid. 404(b). "Rule 404(b) is a rule of inclusion," *United States v. Alfonso*, 759 F.2d 728, 739 (9th Cir.1985), and evidence is admissible under Rule 404(b) if it is "relevant to an issue in the case other than [the] defendant's criminal propensity," *Green*, 648 F.2d at 592. Meling threatened his father-in-law and uncle to intimidate them into withholding information from the FBI; this shows consciousness of guilt—second only to a confession in terms of probative value. Meling bought an expensive firearm the day after sending in the application for accidental death benefits coverage, and the purchase not only added to the Melings' already substantial debt, but also drove their checking account into the red. Evidence of that purchase was relevant to Meling's motive—greed. And the portions of the taped conversations containing profanity were part of larger sections of tape showing Meling's attempts to hinder the FBI's investigation; like the evidence of his threatening behavior, they show consciousness of guilt. Thus, the evidence was introduced for a purpose other than showing Meling's bad character, and the district court explicitly instructed the jury to "consider the evidence about other acts of the defendant only as it

bears upon the defendant's motive, intent, plans and knowledge and for no other purpose."

▮▮▮ Evidence admissible under Rule 404(b) may nevertheless be excludable under Rule 403 if its prejudicial impact substantially outweighs its probative value. *See Alfonso*, 759 F.2d at 739. In this respect, the profanity in the tapes was relatively mild by today's standards. *See United States v. Bufalino*, 683 F.2d 639 (2d Cir.1982) (tape recording of extortion threat replete with obscenities not unduly prejudicial). The only real concern is the evidence that Meling owned firearms; "[o]rdinarily the admission into evidence of weapons, or pictures of weapons, which are not directly related to the crime, and to which proper objection is made, is prejudicial to the defendant and in many cases it has been held to be reversible error." *United States v. Peltier*, 585 F.2d 314, 327 (8th Cir.1978); *see also United States v. Hitt*, 981 F.2d 422 (9th Cir.1992). However, in this case the prosecution solicited only testimonial evidence of Meling's purchase of a firearm, without even inquiring into the type of firearms Meling owned, and the effect of the firearm's purchase on the Melings' finances was highly probative of Meling's motive. One witness did volunteer that she broke off her friendship with the Melings because of the presence of loaded guns in the house, and the prosecutor commented on this testimony in her closing argument, but this is a far cry from the photographs and physical introduction of guns which we have held to be prejudicial. *See, e.g., Hitt*, 981 F.2d at 423–24 (photograph of the defendant in a room full of guns which he did not own, introduced to establish that the gun he owned was clean, was unduly prejudicial).

### 2. *Prosecutorial Misconduct*

▮▮▮ Meling also has not substantiated his claim of prosecutorial misconduct. The prosecutor did not introduce any evidence of Meling's character that was not admissible under Fed.R.Evid. 404(b). Nor did the prosecutor violate the pretrial order on the motion in limine, which only prohibited her from

soliciting evidence about the type of firearms Meling collected, or the pretrial agreement, which precluded the government from soliciting testimony that certain striptease dancers feared Meling. And the prosecutor did not improperly vouch for the credibility of any witness. Meling complains that the prosecutor bolstered the testimony of a witness by establishing that the witness had previously testified in a product tampering case. But the prosecutor did not "place the prestige of the government behind the witness," or suggest that "information not presented to the jury supports the witness's testimony." *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir.1980). The prosecution's questions on direct examination may have sought inadmissible character evidence to bolster the witness' credibility, *see* Fed.R.Evid. 608, but introducing such bolstering evidence is not the same as vouching for the witness; standing alone this does not amount to prosecutorial misconduct. *Yarbrough*, 852 F.2d at 1539 ("Every slight excess of a prosecutor does not require that a verdict be overturned and a new trial ordered.").

**D. Sentencing**

■ The district court sentenced Meling to life in prison under the 1992 Sentencing Guidelines.[3] We review the district court's application of the Sentencing Guidelines de novo. *United States v. Kohl*, 972 F.2d 294, 297 (9th Cir.1992).

■ In cases of product tampering that result in death, the 1992 Guidelines direct the court to apply the sentencing guideline for first degree murder "if the death was caused intentionally or knowingly." U.S.S.G. § 2N1.1(c)(1). The Guidelines do not define "knowingly" or "intentionally," but we can apply the Model Penal Code definitions of these terms by analogy. *See United States v. Karlic*, 997 F.2d 564, 569 (9th Cir.1993). The Model Penal Code states that a defendant acts "knowingly" if "he is aware that it is practically certain that his conduct will cause [the result prohibited by law]." Model Penal Code § 2.02(2)(b)(ii).

■ Under the Model Penal Code definition (or *any* rational definition) Meling knowingly killed two people. Callously disregarding the suffering he might inflict, Meling had the basest of motives: He wanted to divert attention from his heinous attempt to kill his wife for profit. Acting without compassion, Meling calculated that a few random deaths would throw the FBI off his trail. To this end, he laced five packages of Sudafed with poison, intending that they be ingested by unsuspecting victims, and knowing that these victims would die horrible deaths. The only detail missing from Meling's calculus was the identity of the people he would kill. That he was unaware of the victims' identities, however, does not make his conduct any less culpable. Meling was aware to a practical certainty that someone—perhaps as many as five people—would die to help save his skin. Nor does the victims' anonymity make his crime any less gruesome. If anything, the randomness of the act only renders it more cruel.

■ For product tampering that results in death caused knowingly, the Guidelines require application of the sentencing guideline for first degree murder. U.S.S.G. § 2N1.1(c)(1). First degree murder carries a base offense level of 43, U.S.S.G. § 2A1.1(a), which in any criminal history category requires a life sentence. We can't say that this shocks the conscience; indeed, any lesser sentence would.

**AFFIRMED.**

---

**3.** The district court also found that a life sentence would be appropriate under the 1990 Guidelines. But Meling argues that the 1992 Guidelines should apply and, as we affirm under that version of the Guidelines, we do not address the application of the 1990 Guidelines.