UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

United States of America

    v.

Jonathan Tanguay

Criminal No. 11-cr-173-JL
Opinion No. 2015 DNH 188

**MEMORANDUM ORDER**

After remand by the First Circuit Court of Appeals,[1] the court revisits defendant's motion to suppress evidence seized pursuant to a search warrant in this child pornography possession case. Having reviewed the parties post-remand briefs and held oral argument, and applying the legal rubric enunciated by the appellate panel, the court again denies the motion to suppress.[2] Although the court finds that the warrant affiant's failure to make further inquiry into Josh Wiggin's past was reckless and that such inquiry would have yielded information that should have been included in the affidavit, the court finds that the affidavit, reformed to include the missing information, still supports a finding of probable cause.

## I.  Issues on Remand

The Court of Appeals directed this court to consider four questions on remand:

---

[1] 787 F.3d 44 (1st Cir. 2015) ("Tanguay II").

[2] The parties agreed that admission of additional evidence was not necessary.

1.   Did the information known to Lt. Nolet give her an obvious reason to doubt Joshua Wiggin's truthfulness and, thus, trigger a duty of further inquiry. Tanguay II, 787 F.3d at 54.

2.   If such a duty was triggered, were Lt. Nolet's doubts of such a magnitude that her failure to conduct an additional inquiry evinced a reckless disregard for the truth, rather than mere negligence. Id.

3.   If the answers to the first to questions are in the affirmative, the court must then determine whether Lt. Nolet, had she made good-faith efforts to dispel her doubts, would have discovered new information that should have been included in her affidavit. Id.

4.   Finally, if the court finds that the information should have been included, the court must assess whether the reformed affidavit would continue to support a finding of probable cause. Id.

## II.  **Facts and Stipulations**

This court, in its original denial of Tanguay's motion,[3] and subsequently the Court of Appeals, provided thorough summaries of the pertinent facts. Accordingly, with the exception of certain post-appeal stipulations, the court eschews another factual recitation and proceeds directly to the issues presented by the appeals tribunal.

Prior to submitting their post-appeal memoranda, the parties stipulated that, if Lt. Nolet had accessed Wiggin's NCIC criminal record, it would not have included the 1998 juvenile adjudication for making a false report. The parties further agree that if Nolet had asked Sergeant Boyer to provide additional information

---

[3] 907 F. Supp. 2d 165 (D.N.H. 2012) ("Tanguay I").

2

about Wiggin's "scrapes with the law," he would have provided her with a document showing Wiggin's contact with the Conway Police Department, which would have identified the juvenile false report adjudication.  Finally, the parties agree that the underlying Conway Police reports relevant to Wiggin would have been available to Nolet if she had asked to review them.

**III.  Analysis**

A.  Duty of Further Inquiry

The first question presented to the court requires little discussion.  Conway Police Sgt. Broyer informed Nolet that:

> Wiggin was known as a "police groupie" who was
> "quirky," "troubled" in his teen years, and had a
> history of suicidal ideation. Broyer also commented
> that Wiggin had experienced "a few scrapes" with the
> law, specifically mentioning that Wiggin had been
> convicted of uttering a false prescription (he had
> altered the number of Vicodin pills on a legitimate
> prescription from 30 to 80 before presenting the
> prescription to a pharmacist).

Tanguay II, 787 F.3d at 47; Tanguay I, 907 F. Supp. 2d at 168-69. As the government concedes, this information triggered Lt. Nolet's duty of further inquiry.

B.  Reckless Disregard for the Truth

Having established that Lt. Nolet's duty of further inquiry was triggered, the court's next task is to ascertain whether Lt. Nolet's doubts about Wiggin's truthfulness were of such a magnitude that her failure to conduct an additional inquiry evinced a reckless disregard for the truth, rather than mere

3

negligence.  Tanquay II, 787 F.3d at 54 (citing United States v. Ranney, 298 F.3d 74, 78 (1st Cir. 2002)).  Reckless disregard for the truth, in turn, may be proven either by evidence that Lt. Nolet "in fact entertained serious doubts as to the truth of the allegations contained in the affidavit, or by inference from circumstances evincing obvious reasons to doubt the veracity of the allegations."  Id. at 52 (citing Ranney, 298 F.3d at 78) (internal quotation marks omitted)(emphasis added)).

Once again, little discussion is required for the court to conclude that Lt. Nolet was reckless in failing to inquire further.  Indeed, absent this court's impermissible categorical finding that there was, as a matter of law, no duty of further inquiry, Tanquay I, 907 F. Supp. 2d at 182, the court likely would have found her reckless in the original proceeding. Specifically, the court observed that after her contact with the Conway Police Department, Lt. Nolet

> understood full well that [Wiggin's] credibility was at issue, based on his felony falsification conviction, if nothing else.  Indeed, one would have to be unusually tone-deaf to understand Sergeant Broyer's description of Wiggin--as a "quirky" "police groupie" who had "scrapes with the law," including a felony falsification conviction, and who, as a teenager, had been "troubled" and "suicidal"--as anything other than an alert that Lieutenant Nolet should not simply assume he was credible.  Yet Lieutenant Nolet indulged just that assumption, and did nothing further to check Wiggin's background (even the seemingly easy and obvious step of asking Sergeant Lieutenant Nolet what he meant by "scrapes").

4

*Tanquay I*, 907 F. Supp. 2d at 182 (emphasis added).  Ultimately this court found that Lt. Nolet "could have--and almost certainly should have--learned those facts before seeking the warrant . . . ."  Id.  It is only because the court believed – erroneously, as the Court of Appeals held – that there could be no duty of further inquiry, that the court excluded the remainder of Wiggin's criminal history from consideration.  Id. at 182-83.  Against this backdrop, the court has little trouble concluding that Lt. Nolet's failure to further inquire as to Wiggin's criminal history was reckless.

The Government's arguments on remand do little to sway the court.  The government posits that Lt. Nolet's failure to inquire could not have been reckless because the Court of Appeals's ruling that she had a duty to inquire "established new law."  Accordingly, the argument goes, Lt. Nolet could not have had the requisite mental state to be found reckless.  The court disagrees.  In the first place, the government's "new law" argument reads as little more than a post-hoc analysis of why the Court of Appeals was incorrect, not why the law is new.

Next, it is not clear that the law is new.  It is true that the Court of Appeals observed that the failure to investigate further "rarely suggests knowing or reckless disregard for the truth."  *Tanquay II*, 787 F.3d at 52-3 (quoting *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994)(quoting *United*

5

States v. Dale, 991 F.2d 819, 844 (D.D.C. 1993)).  However, the appellate panel, relying on circuit precedent, qualified its assessment by noting that this "prevailing view" makes sense "when the affiant has no substantial reason to doubt the veracity or completeness of information included in her affidavit."  Id.; (citing Ranney, 298 F.3d at 78 and United States v. Santana, 342 F.3d 60, 66 (1st Cir. 2003)).  It was against this somewhat muddled backdrop that the Circuit remanded the case – because there may have been such a "reason to doubt" the affidavit's completeness.[4]

Ultimately, however, resolution of the "new law" question is unnecessary because the argument fails substantively.  The "new

---

[4] Although not dispositive, the court also notes that the Court of Appeals is rarely shy about acknowledging the establishment of new precedent.  See, e.g., United States v. Dávila-Ruiz, 790 F.3d 249, 250 (1st Cir. 2015) ("The matter at hand requires us to decide a question of first impression in this circuit . . ."); United States v. Mei Juan Zhang, 789 F.3d 214 ("These two appeals present two questions of first impression in this circuit . . ."); United States v. Alphas, 785 F.3d 775, 777 (1st Cir. 2015) ("This appeal requires us to decide two issues of first impression in this circuit.").  Here, there was no such pronouncement.  Moreover, the duty of further inquiry is not unheard of in other Fourth Amendment contexts.  For example, where an officer is presented with ambiguous facts related to an individual's authority to consent to a search, the officer has a duty to investigate further before relying on the consent.  See Illinois v. Rodriguez, 497 U.S. 177, 188 (1990) ("Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry."), cited with approval in United States v. Meada, 408 F.3d 14, 21 (1st Cir. 2005).

law" argument is part and parcel of the government's claim that only Lt. Nolet's subjective state of mind is relevant to the recklessness inquiry. (Gov't Memo (Doc. No. 217) at 9-10). But, as previously noted, the Court of Appeals did not so hold, reiterating the position set forth above and in Ranney that recklessness can be "infer[red] from circumstances evincing obvious reasons to doubt the veracity of the allegations." 298 F.3d at 78. There is nothing in Tanguay II that supports the government's position that Nolet's knowledge of 4th Amendment jurisprudence is one of the "circumstances" under consideration. Instead, as Ranney explicitly instructs, the relevant "circumstances" are those related to Wiggin's veracity.[5] Here, the issues raised about Wiggin's veracity, detailed supra, at 4, were obvious. Thus, the court finds that Lt. Nolet's failure to conduct an additional inquiry evinced a reckless disregard for the truth.

C.  Discovery and Inclusion

The Court of Appeals next tasked this court with determining whether Lt. Nolet, had she made good-faith efforts to dispel her doubts about Wiggin's veracity, would have discovered new

---

[5]By contrast, the establishment of new law might be relevant to an officer's qualified immunity defense to a civil rights lawsuit, e.g., Mitchell v. Miller, 790 F.3d 73, 78 (1st Cir. 2015), or an officer's mistaken belief as to the substantive law under which he is arresting a subject. E.g., Heine v. North Carolina, 135 S.Ct. 530 (2014). Neither of those circumstances is present here.

information that should have been included in her affidavit.  The court finds that she would have discovered such information.  Specifically, she would have discovered Wiggin's juvenile adjudication for making a false report to law enforcement.  While the government argues that Lt. Nolet would have only performed a NCIC check – which would not have revealed the juvenile adjudication – it also candidly points out that she testified that she never before had run such a check on a witness.  Nevertheless, because the NCIC check is the only sort of further inquiry that Lt. Nolet even mentioned during her Franks testimony, the government posits that that is the likely course she would have taken.  The court disagrees.  It seems far more likely to the court that Lt. Nolet would have taken the "seemingly easy and obvious step of asking Sergeant [Broyer] what he meant by 'scrapes' with the law."  Tanguay I, 907 F. Supp. 2d at 182.[6]  As the parties have stipulated, such an inquiry would have inexorably led to the discovery of the juvenile false report adjudication.  Moreover, the government limits its argument on this question only to how Lt. Nolet would have investigated.  It implicitly concedes that the false report adjudication, if

_____

[6]As defendant suggested at oral argument, Lt. Nolet might have pursued both avenues of investigation.  Resolution of that hypothetical is not necessary, as the juvenile adjudication would only have been revealed via the Conway Police inquiry.

8

discovered, would have been included in the warrant application.[7] Accordingly, having answered the first three questions posed by the Court of Appeals in the affirmative, the court turns to the reformed affidavit.

D.  Probable Cause

As previously noted, Tanguay II affirmed this court's conclusion that probable cause still existed when the warrant application was reformed to include the first batch of withheld information. Id. at 50-51. Nevertheless, the appellate panel did not foreclose the possibility that the totality of the circumstances might be altered by additional information about Wiggin's false report. Id. at 51, n.2. Although the court has answered the first three questions the Court of Appeals posed favorably to Tanguay, those victories are ultimately empty, as the court finds that even after inserting the recklessly omitted

---

[7] The record reflects that Wiggin's arrests for shoplifting and receiving stolen property did not end in convictions. Regardless, as these are not "crimes involving dishonesty or false statement" the court does not consider them with respect to Wiggin's truthfulness. See Linskey v. Hecker, 753 F.2d 199, 201 (1st Cir. 1985) (observing that larceny, burglary, armed robbery and shoplifting are not crimes involving dishonesty or false statements within the meaning of Fed. R. Evid. 609(a)(2)). Defendant argues that the circumstances of the two charges – Wiggin first denied committing the crime in each case – is a sufficient showing of dishonesty to justify inclusion in the warrant. As the Court of Appeals has noted, however, a witness' credibility "is not undercut merely because he made predictable denials" at first. United States v. Rumney, 867 F.2d 714, 720 (1st Cir. 1989). Regardless, adding these two crimes from 1999 to the mix does not alter the outcome.

facts, the corrected warrant affidavit would establish probable cause.

"Probable cause exists whenever the circumstances alleged in a supporting affidavit, viewed as a whole and from an objective vantage, suggest a 'fair probability' that evidence of a crime will be found in the place to be searched." United States v. Clark, 685 F.3d 72, 75 (1st Cir. 2012) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

The court starts with the proposition that "the statements of a law-abiding eye-witness to a crime are generally considered reliable without further corroboration." Id. at 50. In the present context, a "law-abiding eyewitness" is one not involved in the crime being reported. Thus Wiggin, whatever his past, qualifies. That said, the parties did not dispute the court's observation at oral argument that probable cause determinations are frequently upheld where the informant is not only involved in the crime, but is being paid or is seeking leniency in exchange for information. Moreover, even a conviction, which requires a much greater quantum of evidence than a probable cause determination, can be upheld even if it is "based solely upon the uncorroborated testimony of an accomplice . . . as long as the jury is properly instructed and the testimony is not incredible as a matter of law." United States v. Peña-Lora, 225 F.3d 17, 23-24 (1st Cir. 2000). Yet here, as the Court of Appeals noted,

10

there is additional evidence that supports a finding that "Wiggin's account was worthy of credence":

> Wiggin was willing to be identified despite his embarrassment about the potential revelation of his sexual orientation to his loved ones; he candidly admitted that there might be compromising pictures of him in the appellant's possession (and, thus, likely to surface in the search); and the record contains no credible suggestion of any ulterior motive for reporting the crime. All of these are positive factors in assessing Wiggin's veracity.

Id.[8]

The probable cause determination thus boils down to whether the above is overborne by the 1998 false report juvenile adjudication. The court believes it is not. In the first place, "[e]ven a prior conviction for a crime of dishonesty is not always dispositive of a witness' reliability." Id. (citing United States v. Meling, 47 F.3d 1546, 1554-55 (9th Cir. 1995)). Notably, in Meling, while finding that an affiant had recklessly omitted an informant's 10-year old fraud and forgery convictions, the court relied on, inter alia, the staleness of those convictions to nevertheless affirm a finding of probable cause. 47 F.3d at 1555. Similarly, here, Wiggin's false report took place nearly twelve years before the report at issue, when he was

---

[8]In Tanguay I, this court noted two potential ulterior motives that may have influenced Wiggin: his parents' animosity toward Tanguay, and his own anger at Tanguay's suggestion that Wiggin harbored a sexual desire for his girlfriend's minor son. 907 F. Supp. 2d at 179. The court, however, ultimately assigned them no weight. Id. As the parties agreed at oral argument, the Court of Appeals left this finding undisturbed.

11

sixteen years old.  Cf. Eddings v. Oklahoma, 455 U.S. 104, 115-16 ("Our history is replete with laws and judicial recognition that minors, especially in their earlier years, generally are less mature and responsible than adults.").

Tanguay argues that the similarities in the 1998 incident in which Wiggin lied about a false shooter and his initial creation of a false email identity in this case, "show the level of dishonesty he is capable of . . . ."  While there is a surface similarity, there is an important difference.  In the earlier case, although he made a false report, Wiggin did not falsely accuse a specific individual.  Thus, there is nothing in the prior conviction to suggest that Wiggin had any propensity to lie in order to "frame" another individual, as the defense implicitly suggests here.  Tanguay further argues that the details of the false reporting incident, which his brief describes as a reported "assassination attempt," and which defense counsel described in similarly hyperbolic terms during oral argument, also subverts the probable cause determination, essentially by making Wiggin inherently unbelievable when considering the other facts omitted from the warrant.  The court disagrees.  While Wiggin's admission that he shot himself in the leg "to see what it felt like" is consistent with being a "troubled teen," it does not support the considerable weight that Tanguay tries to hang on it, specifically, that it would cause a Magistrate to set aside the

12

facts suggesting a "fair probability" that evidence would be found at Tanguay's residence.

With the above in mind, the court finds that inserting the false report adjudication into the probable cause calculus does not change the result.

## IV.  Conclusion

"[A] court may reasonably find probable cause despite some level of concern about the completeness of the investigation." Tanguay II, 787 F.3d at 53.  Here, the court's "concern" with the shortcomings of Lt. Nolet's investigation is as serious as it was in its initial ruling.  Nevertheless, that concern remains "insufficient to erode probable cause."  Id.  Defendant's Motion to Suppress[9] is therefore DENIED.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

October 7, 2015

cc:  Behzad Mirhashem, Esq.
     Jeffrey S. Levin, Esq.
     Nick Abramson, AUSA
     Seth R. Aframe, AUSA

---

[9] Doc. no. 34 (supplemented by Doc. no. 221)

13