**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Thomas Dale PETERSON,**
**Defendant–Appellant.**

No. 03–30025.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 2, 2003.

Filed Dec. 30, 2003.

Robert Gombiner, Assistant Federal Public Defender, Seattle, WA, for defendant-appellant Thomas Dale Peterson.

Helen J. Brunner, Assistant United States Attorney, Seattle, WA, Ilene J.K. Miller, Assistant United States Attorney, Tacoma, Washington, for plaintiff-appellee United States of America.

Before: KLEINFELD, GOULD, and TALLMAN, Circuit Judges.

TALLMAN, Circuit Judge.

Thomas Dale Peterson asserts that a police SWAT team failed to fully comply with the knock-and-announce requirement prior to executing a warrant to search his residence. He appeals the denial of his motion to suppress the evidence found. Because the SWAT team's entry in this case violated neither the Fourth Amendment nor 18 U.S.C. § 3109, we affirm.

I

In late 2001, Vancouver, Washington, police officers, acting in cooperation with police in nearby Portland, Oregon, learned that Peterson was involved in an identity theft operation and other criminal conduct.

This information came from three sources who supplied probable cause for issuance of the search warrant. The first source told police that Peterson and an associate named Tai Watson had been stealing mail in Portland and Vancouver.[1] According to this source, Peterson possessed a ring of duplicate U.S. Postal Service mailbox keys, and the floor of Peterson's room in his Vancouver residence was littered with stolen mail. The source also told police that Watson possessed a black SKS assault rifle and some two-part (binary) plastic explosives.[2]

According to the first source, after Watson was arrested he phoned from jail and requested that the source transfer the explosives (which Watson and the source referred to as "the bin Laden") from Watson's apartment to a second apartment in Beaverton, Oregon. Based on this information, the police sought and received consent to search the second apartment, where they seized approximately two pounds of Kinepak binary explosives.

A second source further informed police that Peterson was a "master" forger and identity thief who used a computer to produce fraudulent checks and false identification. This individual also reported that Peterson used methamphetamine and heroin and that Watson had brought $3,000 worth of explosives to Peterson's residence in early November 2001. The second source supplied police with a map to Peterson's residence on 4th Way in Vancouver.

On December 5, 2001, a third source confirmed to police that Peterson lived on 4th Way and that he used a computer in his bedroom to create fake checks and

---

**1.** Watson had been arrested ten days earlier in connection with a mail theft investigation in Portland.

**2.** Binary explosives consist of two component chemical halves, which when combined be-

come an explosive. A detonator is then required to initiate the explosion. Binary explosives are safer to store than dynamite but just as powerful.

identification. This source further reported that Peterson had about 200 pieces of stolen mail strewn about his room, and that within the previous week the source had seen Peterson in possession of blasting caps and pink liquid explosives. Specifically, this source reported that the explosives and blasting caps were hidden in Peterson's bedroom closet and that Peterson had claimed "if we want to blow some shit up we can at any time."

In light of this information, Vancouver police sought and received a state warrant to search Peterson's residence.[3] Because of the suspected presence of explosives, police commanders considered the execution of the search warrant to be high-risk. Accordingly, they decided to seek assistance from officers specially trained and equipped for such duties, and recruited the Southwest Washington Regional SWAT team to serve the warrant.

In preparation for this operation, the SWAT team held a pre-raid briefing at 7:00 p.m. on December 5, 2001. The team was told that Peterson's house would most likely contain both explosives and items pertaining to identity theft and check fraud, including many pieces of stolen mail. The team was also informed that Peterson and others at the residence were suspected of drug use. Although the team was told there were no known firearms at the location, police knew that Peterson had an outstanding Oregon arrest warrant for carrying a concealed weapon without a permit. Continuing surveillance during the briefing session reported that at least three to four people were then inside Peterson's residence.

Just after 8:00 p.m., the SWAT team deployed to Peterson's residence. The team members wore helmets and raid clothing clearly labeled "POLICE" in large reflective letters. Officers surrounded the house and closed off traffic in the neighborhood. An ambulance was positioned nearby in case of need. The main entry team proceeded to the front door, led by Corporal Lobdell. The team members began taking their final positions, although they were not yet ready to knock and announce their identity and intentions.

What happened next was the subject of disputed testimony at the evidentiary hearing on Peterson's motion to suppress. However, in response to the government's request for a factual finding at the close of the hearing, the district court expressly credited Lobdell's version of the events. This finding was not clearly erroneous. Accordingly, we adopt Lobdell's version of the facts.

According to Corporal Lobdell, just before he was ready to knock, someone inside the house—later identified as Guy Edwards, the boyfriend of Peterson's housemate—suddenly opened the front door. According to Edwards's testimony, he heard noises outside and was checking for a possible prowler when he surprised the police in the final throes of staging for their entry. Edwards, who admitted at the hearing that he recognized the group on the porch as police officers, immediately attempted to close the door. Lobdell responded by shouting "Police, with a search warrant;" he forced the door open, and led the SWAT team inside. Virtually simultaneously, other officers on either side of the house broke windows to gain entry. In the course of breaching the house, the SWAT team threw inside three noise flash distraction devices (also called "stun grenades"). The occupants were swiftly subdued and the police seized a quantity of binary explosives, six blasting caps, 5.8

---

**3.** Peterson does not challenge the validity of the search warrant, only the manner in which it was executed.

grams of methamphetamine, a quantity of tar heroin, over 1000 pieces of stolen mail, more than 20 fake IDs, illegal duplicates of mailbox keys, a laminator, a credit card imprinting machine, counterfeit and forged checks, and $10,500 in cash.

The district court denied Peterson's motion to suppress these items as the fruits of an illegal search. Peterson entered a conditional plea of guilty to one count of possession of stolen mail, one count of bank fraud, and one count of being a felon in possession of explosives. This plea, while conditioned on Peterson's right to appeal the denial of his motion to suppress, did not specifically reserve the right to claim on appeal that the police employed excessive force during execution of the search warrant.

The instant appeal ensued. There is no challenge to our jurisdiction under 28 U.S.C. § 1291.

## II

 We review de novo the district court's denial of Peterson's motion to suppress. *See United States v. Fernandez–Castillo,* 324 F.3d 1114, 1117 (9th Cir. 2003). The factual findings underlying the denial are reviewed for clear error. *See id.* Whether the SWAT team's failure to adhere to the knock-and-announce statute, 18 U.S.C. § 3109, was justified by exigent circumstances is a mixed question of fact and law that we review de novo. *See United States v. Hudson,* 100 F.3d 1409, 1417 (9th Cir.1996).

### A

 Peterson first argues that the entry of his residence was unreasonable under the Fourth Amendment. The district court correctly rejected this claim.

In *Richards v. Wisconsin,* 520 U.S. 385, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997), the Supreme Court instructed that a "no-knock" entry is constitutionally permissi-

ble in three situations: when officers "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be [1] dangerous or [2] futile, or that it would [3] inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Id.* at 394, 117 S.Ct. 1416. *Richards* continues: "This standard—as opposed to a probable-cause requirement—strikes the appropriate balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by no-knock entries." *Id.; see also Wilson v. Arkansas,* 514 U.S. 927, 934, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995) ("The Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests.").

The police in *Richards* obtained a warrant to search a suspect's motel room for drugs. A plainclothes officer knocked on the door and identified himself as a maintenance man. Leaving the chain on the door, Richards peeked out. Catching sight of a uniformed officer standing behind the plainclothes officer, Richards quickly closed the door. The officers forced their way into the room, apprehended Richards as he attempted to escape through a window, and discovered drugs hidden above ceiling tiles in the bathroom. *See Richards,* 520 U.S. at 388–89, 117 S.Ct. 1416. The Supreme Court, in a unanimous opinion, excused the officers' failure to knock and announce. The Court held that the entry did not violate the Fourth Amendment because "[o]nce the officers reasonably believed that Richards knew who they were ... it was reasonable for them to force entry immediately given the disposable nature of the drugs." *Id.* at 395, 117 S.Ct. 1416.

On the record before us, we see this case as closely analogous to *Richards*. Exigent circumstances arose during staging for the entry in both cases. A no-knock entry was clearly justified here. Indeed, only two of the three contemplated justifications for a no-knock entry were present in *Richards* (futility and potential destruction of evidence). Here, the SWAT team deployed to Peterson's residence encountered all three (futility, potential destruction of evidence, *and* danger).

Turning first to the issue of futility, the SWAT team originally intended to announce its presence. However, just as this announcement was about to be made, Edwards unexpectedly opened the door, saw that police were outside, and attempted to deny them entry. Were we to hold that the police were required to announce their presence in this case and wait some further period of time while the occupants reconsidered whether to admit or resist them, it would amount to mandating a meaningless act. Announcement would have been futile. Just as one cannot close a door that is already closed, one cannot "announce" a presence that is already known. The Fourth Amendment's "touchstone of reasonableness," *United States v. Ramirez*, 523 U.S. 65, 71, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 108–109, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)), simply does not mandate the redundant formalism that Peterson urges upon us here. *See Miller v. United States*, 357 U.S. 301, 310, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958) ("It may be that, without an express announcement of purpose, the facts known to officers would justify them in being virtually certain that the petitioner already knows

their purpose so that an announcement would be a useless gesture.").[4]

In addition to Edwards's conduct, the government points to the exigencies of danger and the potential destruction of evidence as justification for the manner in which the warrant was served. *See United States v. Banks*, 540 U.S. ——, 124 S.Ct. 521, 527, 157 L.Ed.2d 343 (2003) (courts must consider the "particular exigenc[ies] claimed" when evaluating the legality of an entry). The record reveals that the officers' concerns were well-founded. The Constitution does not require police officers to expose themselves to unnecessary and considerable personal risk and potential loss of evidence when carrying out a court-ordered search.

First, the SWAT team reasonably believed that Peterson's residence contained explosives. Ample probable cause supported this conclusion. The officers' concern was not generalized and subjective; it was based on information received from two separate sources. *See United States v. Granville*, 222 F.3d 1214, 1219 (9th Cir. 2000) (claims of exigent circumstances must be based on more than "generalizations and stereotypes"). The prior search in Beaverton, Oregon had corroborated their information, yielding part of the explosives cache. The third source told police not merely that Peterson possessed explosives, but that he had claimed a readiness "to blow some shit up . . . at any time." Further, although the officers had no information regarding any specific firearms at his residence, they knew that Peterson had been known to carry a concealed weapon illegally.

---

4. Although the search in *Miller* was deemed unconstitutional, this case is clearly distinguishable. In *Miller*, it was ambiguous whether the suspect recognized the police at his door. *See* 357 U.S. at 311, 78 S.Ct. 1190 (noting that the officers were not in uniform and announced their identity "in a low voice"). Here, it is undisputed that Edwards recognized the SWAT team for what it was: a group of police officers about to enter Peterson's house.

This particularized fear of the potential for danger provided further justification for the SWAT team's no-knock entry. *See Bailey v. Newland,* 263 F.3d 1022, 1033 (9th Cir.2001) ("[E]xigent circumstances are present when a reasonable person [would] believe that entry ... was necessary to prevent physical harm to the officers or other persons....") (quotation marks and citations omitted) (first ellipsis in original); *see also Ramirez,* 523 U.S. at 71, 118 S.Ct. 992 (upholding no-knock entry where the police "certainly had a 'reasonable suspicion' that knocking and announcing their presence might be dangerous to themselves or to others," given that the subject reportedly had access to weapons and had "vowed that he would 'not do federal time' ").

Second, the SWAT team knew that Peterson's residence very likely contained methamphetamine. Once the occupants knew police were outside, the suspected presence of drugs—the quintessential disposable contraband—provided yet another justification for the no-knock entry. *See Richards,* 520 U.S. at 396, 117 S.Ct. 1416 ("These actual circumstances—petitioner's apparent recognition of the officers combined with the easily disposable nature of the drugs—justified the officers' ultimate decision to enter without first announcing their presence and authority.").

*United States v. Banks,* the Supreme Court's most recent pronouncement on the execution of residential search warrants, reaffirmed the Court's well-established rule of treating "reasonableness as a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of circumstances in a given case." 124 S.Ct. at 525. Applying this analytical approach here, we conclude that the SWAT team's decision to immediately enter Peterson's home was entirely reasonable, and therefore lawful under the Constitution and the laws of the United States.

Peterson challenges the fact that the SWAT team's preliminary pre-raid plan for serving the warrant seems to have contemplated dispensing with the requirements of the knock and announce rule. Specifically, both of the government's witnesses at the hearing (Corporal Lobdell and Sergeant Chapman) testified that the team intended to forcibly enter Peterson's residence immediately after knocking and announcing. The Supreme Court has said that in the usual case police must give the inhabitants a reasonable opportunity to let them in before breaking down the door. *See id.* But the Court in *Banks* recognized that "if circumstances support a reasonable suspicion of exigency when the officers arrive at the door, they may go straight in." *Id.* When Edwards affirmatively refused to admit the police, the factors of futility, danger, and potential destruction of evidence supported the officers' decision to enter immediately.[5]

In short, any predetermined strategy for effecting the raid fell by the wayside, and immediate entry was justified. The lawfulness of the team's original plan is not relevant to our consideration; our role is to evaluate the events as they actually transpired. *See Richards,* 520 U.S. at 395, 117 S.Ct. 1416 ("[T]he reasonableness of the officers' decision ... must be evaluated as of the time they entered...."). Since the actual service of the warrant in

---

**5.** We note that in a particular case any one of these factors may be sufficient to justify a no-knock entry. However, the Fourth Amendment reasonableness test analyzes totality of the circumstances. We do not break down the situation faced by police into its component parts and evaluate the strength of each justification seriatim. Here, all three factors were present, and the facts considered together more than adequately established exigent circumstances.

this case was lawful in light of the exigent circumstances created by the occupants, we affirm the district court's denial of Peterson's motion to suppress on Fourth Amendment grounds.

## B

■ Peterson next contends that the SWAT team violated the "knock and announce" statute, 18 U.S.C. § 3109. We disagree.

Section 3109 provides:

**Breaking doors or windows for entry or exit**

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, *if, after notice of his authority and purpose, he is refused admittance* or when necessary to liberate himself or a person aiding him in the execution of the warrant.

18 U.S.C. § 3109 (emphasis added). Edwards obviously knew that by trying to close the door he was denying entry to the police. Thus, under the plain language of the statute the entry was lawful.

Furthermore, the exigent circumstances we discuss with regard to the Fourth Amendment apply with equal force in the § 3109 context. *See Ramirez,* 523 U.S. at 73, 118 S.Ct. 992. *Banks* is instructive on this point. The Court in *Banks* confirmed the *Ramirez* principle that " § 3109 is subject to an exigent circumstances exception, which qualifies the requirement of refusal after notice, just as it qualifies the obligation to announce in the first place." *Banks,* 124 S.Ct. at 529 (internal citation omitted). Once an exigency "matures," the police are "not bound to learn anything more or wait any longer before going in, even [if] their entry entail[s] some harm to the building." *Id.* at 527. As this is precisely what occurred here, Peterson's § 3109 claim is meritless.

## C

Finally, Peterson asserts that the officers employed excessive force during execution of the search warrant. However, this issue is not properly before us as a separate claim because it was not expressly preserved for appeal in the conditional plea agreement. *See* Fed.R.Crim.P. § 11(a)(2); *United States v. Colin,* 314 F.3d 439, 447 (9th Cir.2002). Consequently, we deem the argument waived.

## III

The district court properly ruled that the police in this case did not violate Peterson's rights. On the contrary, they completed a difficult and potentially dangerous entry in a lawful and professional manner without injuring anyone. The denial of Peterson's motion to suppress, and his conviction and sentence, are therefore

**AFFIRMED.**