**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

SALVADOR MARTINEZ-GARCIA,
*Defendant-Appellant.*

No. 03-30532

D.C. No.
CR-03-30024-1-
MRH

OPINION

Appeal from the United States District Court
for the District of Oregon
Michael R. Hogan, Chief District Judge, Presiding

Argued and Submitted
September 17, 2004—Portland, Oregon

Filed February 11, 2005

Before: J. Clifford Wallace, Ronald M. Gould, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Gould

1743

**COUNSEL**

Tonia L. Moro, Assistant Federal Public Defender, for the defendant-appellant.

Karin J. Immergut, United States Attorney, Douglas W. Fong, Assistant United States Attorney, for the plaintiff-appellee.

**OPINION**

GOULD, Circuit Judge:

Salvador Martinez-Garcia appeals his conviction for possessing a firearm as an illegal alien, in violation of 18 U.S.C. § 922(g)(5) (2000). Martinez-Garcia argues that the firearm, seized pursuant to a search warrant for his home, should have been suppressed due to alleged violations of the Fourth Amendment and Federal Rule of Criminal Procedure 41. Both arguments turn on the fact that state police officers began their search while waiting for a Spanish-speaking federal officer to arrive before serving Martinez-Garcia, who does not speak English, with the search warrant. Martinez-Garcia further contends that the district court erred in providing him with only a limited hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), and that, in light of allegedly misleading statements and omissions in the affidavit submitted to obtain the search warrant, the warrant was not supported by probable cause. We have jurisdiction pursuant to 28 U.S.C. § 1291 (2000), and we affirm the district court.

**I**

On March 21, 2003, Josephine County Circuit Court Judge Gerald Neufeld issued a search warrant based upon the affidavit of Grants Pass Department of Public Safety Officer Peter J. Jenista, who also served as a detective on the Josephine County Interagency Narcotics Team ("JOINT"). The warrant authorized the police to search for evidence relating to the manufacture, delivery, and possession of methamphetamine at a white house with pink trim and a detached carport located at 12579 North Applegate Road. This house on North Applegate Road was occupied by Salvador Martinez-Garcia and his wife, Edelmira Perez-Zepeda. It was located on the Noble Dairy, which contained other buildings, including a house occupied by Martinez-Garcia's brother, Daniel Martinez-Garcia.

In the affidavit supporting the warrant, Jenista detailed the JOINT investigation into alleged methamphetamine distribution by Juan Diego Contreras, Ignacio Hernandez-Salazar and another Martinez-Garcia brother, Juan Carlos. The investigation included, in part, three controlled methamphetamine buys.

In the first buy on November 20, 2002, JOINT arranged for a named informant, Brian Doland, to purchase methamphetamine from Juan Carlos through an unwitting third party, Chandler Scott. Doland wore a wire, but JOINT officers were unable to hear his conversations because of static interference. Officers gave Doland $350, which he in turn gave to Scott, who agreed to buy methamphetamine from Juan Carlos. Scott took the money and went alone to 12579 North Applegate Road, where JOINT officers observed his car. The buy was unsuccessful: Scott returned and told Doland that Juan Carlos had refused to give him methamphetamine; instead, Juan Carlos took the money in repayment of a debt. Doland and Scott returned together to 12579 North Applegate Road, under the

observation of JOINT officers, in an attempt to get drugs or return of the money, but they were unsuccessful.

JOINT conducted two more controlled buys and observed both of the buys from outside the locations where the drug transactions occurred. On January 10, 2003, Doland arranged to buy methamphetamine from Hernandez-Salazar at the dealer's home on Fruitdale Drive. JOINT officers gave Doland $300 to buy the drugs. Doland reported that when he arrived, Hernandez-Salazar did not have methamphetamine at the house and left Doland with Juan Carlos while he went out. Hernandez-Salazar returned and handed Juan Carlos 16.1 grams of methamphetamine, which Juan Carlos gave to Doland in exchange for the money. JOINT again arranged for Doland to purchase methamphetamine on February 3, 2003 at Hernandez-Salazar's home. Hernandez-Salazar had changed residences to 1248 Darneille Lane, and both Juan Carlos and Hernandez-Salazar told Doland of the move. Doland purchased 14.7 grams of methamphetamine from Hernandez-Salazar and Juan Diego Contreras. Juan Carlos was not present during this third buy.

Doland described the Martinez-Garcia residence at 12579 North Applegate Road in detail and told JOINT officers that Juan Carlos lived in the area that would normally serve as the living room. He informed Jenista that he had been to the North Applegate Road property five times since the failed drug buy in November, including on one occasion when Juan Carlos sold methamphetamine to Scott. Jenista verified with the Oregon Department of Motor Vehicles that Juan Carlos Martinez-Garcia registered his address as 12579 North Applegate Road.

In addition to describing the controlled drug buys, the affidavit specified details about informant Doland, including that he had provided information for monetary consideration. The affidavit also said that Doland had provided information for at least thirty criminal investigations, had not failed any of the

polygraph examinations given in connection with many of these investigations, and had provided information that was accurate and subsequently corroborated. Jenista's affidavit reported that he had run a criminal history on Doland and located no convictions, and that he had advised Doland that giving false information in support of a search warrant is a crime. The affidavit contained corroborating statements from two confidential citizen informants who had purchased methamphetamine at the Darneille Lane and Fruitdale Drive addresses. One of the confidential informants was given and passed a polygraph test regarding the veracity of this information.

The affidavit did not state that Doland had drug charges pending against him in federal district court and that JOINT had agreed to give a favorable recommendation to prosecutors in exchange for Doland's information. The affidavit did not mention Doland's conviction for writing a bad check because the criminal history report run by Jenista had not revealed it. The affidavit did not tell the judge that Juan Carlos and Salvador Martinez-Garcia were brothers, that a third brother, Daniel Martinez-Garcia, also lived in a house on the dairy, or that Juan Carlos had been employed at the facility in November 2002. Jenista showed the affidavit to the district attorney's office before presenting it to the judge.

On March 21, 2003, state law enforcement arrived at 12579 North Applegate Road with a search warrant for the house occupied by Salvador Martinez-Garcia and his family. The officers knocked, announced their presence, and entered. David Raymond, an officer of the Josephine County Sheriff's office and a detective on JOINT, advised Martinez-Garcia that he had a search warrant and showed him some "paperwork." Martinez-Garcia responded by indicating that he did not speak English, and the testimony conflicts as to whether he asked the officer "what was happening" in English. Raymond then stated "orden de registro," which his police manual stated means "search warrant" in Spanish, and telephoned to

Bureau of Immigration and Customs Enforcement ("BICE") agent Fernando Lozano requesting that he come to the house to serve as a translator. Officers removed Martinez-Garcia, his wife, his son, and his sister, Alicia Garcia, from the residence. While waiting for Lozano to arrive and translate, the state officers began to search the house. They soon discovered a handgun in the master bedroom.

Lozano arrived at 12579 North Applegate Road about forty minutes to one hour after the search began, and he read the warrant to Martinez-Garcia, Perez-Zepeda, and Garcia in Spanish. He gave each warnings in compliance with *Miranda v. Arizona*, 384 U.S. 436 (1966). He interviewed each of the adults and asked Martinez-Garcia whether the residence contained any firearms. Martinez-Garcia replied that there was a .22 caliber handgun in the master bedroom. Lozano relayed this information to the searching officers, who said that they had already found the firearm.

Before the execution of the search warrant, Lozano had participated in JOINT briefings with state officers that covered the two sites to be searched, Martinez-Garcia's home on North Applegate Road and Hernandez-Salazar's home on Darneille Road. On March 21, 2003, Lozano initially went to the Hernandez-Salazar residence on Darneille Road and planned to go to the North Applegate Road property even if Raymond had not called him when the need for an interpreter arose. Lozano had participated in the briefing and the investigation in part because he believed that he would have the opportunity to arrest Mexican nationals for immigration violations.

After challenging the search that yielded his firearm in an unsuccessful motion to suppress, Salvador Martinez-Garcia entered a conditional plea of guilty pursuant to Federal Rule of Criminal Procedure 11(a)(2) to one count of possessing a firearm as an illegal alien in violation of 18 U.S.C. § 922(g)(5). On this appeal, he argues that the firearm used in

securing his plea should have been suppressed pursuant to the Fourth Amendment, Federal Rule of Criminal Procedure 41, and *Franks v. Delaware*, 438 U.S. 154 (1978).

**II**

We first consider the Fourth Amendment issue.

**[1]** Martinez-Garcia contends that JOINT officers violated the Fourth Amendment by not serving the warrant at the outset of the search and that the handgun should be suppressed as the fruit of an unlawful search. *See Wong Sun v. United States*, 371 U.S. 471, 484 85 (1963).[1] The warrant requirement of the Fourth Amendment serves important purposes. It requires that any determination of probable cause be reviewed by a neutral and detached member of the judiciary before the warrant issues. It also "assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." *United States v. Chadwick*, 433 U.S. 1, 9 (1977), *abrogated on other grounds*, *California v. Acevedo*, 500 U.S. 565 (1991); *see also Groh v. Ramirez*, 124 S. Ct. 1284, 1292 (2004); *Michigan v. Tyler*, 436 U.S. 499, 508 (1978) ("[A] major function of the warrant is to provide the property owner with sufficient information to reassure him of the entry's legality.").

The notice requirement is not absolute and has not been fully defined by the United States Supreme Court. Most recently in *Groh*, the Court stated that "neither the Fourth Amendment nor Rule 41 of the Federal Rules of Criminal Procedure requires the executing officer to serve the warrant on the owner before commencing the search" under all circumstances. *Groh*, 124 S. Ct. at 1292 n.5; *see also Katz v.*

---

[1] We review de novo a district court's decision not to suppress evidence, and review for clear error the district court's underlying factual findings. *United States v. Celestine*, 324 F.3d 1095, 1100 (9th Cir. 2003).

*United States*, 389 U.S. 347, 355 n.16 (1967) ("[O]fficers need not announce their purpose before conducting an otherwise authorized search if such an announcement would provoke the escape of the suspect or the destruction of critical evidence."); *Ker v. California*, 374 U.S. 23, 37-42 (1963) (holding that officers need not give prior notice of their search when it might allow suspects to destroy evidence). In determining the contours of a reasonable search, courts have balanced the need to give notice to occupants with a sometimes competing need for flexibility that allows police to do their job effectively. Striking the appropriate balance requires a high order of practical wisdom and an open-ended inquiry on the circumstances of the search.

**[2]** "The Fourth Amendment says nothing specific about formalities in exercising a warrant's authorization . . . ." *United States v. Banks*, 124 S. Ct. 521, 524-25 (2003). The Supreme Court has made clear that federal courts are to treat reasonableness in executing a warrant "as a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of the circumstances in a given case." *Id.* at 525. To assess the reasonableness of the execution of a search made pursuant to a warrant, we must consider factors that bear on protecting the privacy due to the public, *see*, *e.g.*, *United States v. Barajas-Avalos*, 377 F.3d 1040, 1055 (9th Cir. 2004) ("The right of a person to privacy within the enclosed interior of a dwelling house is expressly protected from governmental intrusion by the Fourth Amendment."); the needs of law enforcement, *see*, *e.g.*, *United States v. Peterson*, 353 F.3d 1045, 1049 (9th Cir. 2003) ("The Constitution does not require police officers to expose themselves to unnecessary and considerable personal risk and potential loss of evidence when carrying out a court-ordered search."); the reasonable expectations of an informed public, *see*, *e.g.*, *Kyllo v. United States*, 533 U.S. 27, 33-34 (2001) ("It would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology."); and any

other matters appropriately considered as part of the "totality of the circumstances."

Martinez-Garcia argues that delayed service during the March 21, 2003 search of his residence fails this totality of the circumstances test and that JOINT officers conducted an unreasonable search for Fourth Amendment purposes. He contends that if officers are unprepared to describe the warrant in the language of the occupants, they should at least serve the occupants with the English-language copy because the mere presentation of documentation will provide some notice of authority.

[3] We disagree and hold that the law enforcement officers did not act unreasonably in delaying service in light of the totality of the circumstances facing them on March 21, 2003. *See Banks*, 124 S. Ct. at 525.[2] The officers tried to serve the warrant in good faith, were unable to do so on account of a language barrier, and promptly called for interpretive assistance. They served the warrant as soon as was practicable — while the search was ongoing and forty minutes to an hour after it began.[3]

---

[2] We do not hold that an officer never violates the Fourth Amendment by not serving a warrant at the outset of a search; the totality of the circumstances in a different case might make delayed delivery of the warrant unreasonable. *See Groh*, 124 S. Ct. at 1292 n.5 ("Whether it would be unreasonable to refuse a request to furnish the warrant at the outset of the search when . . . an occupant of the premises is present and poses no threat to the officers' safe and effective performance of their mission, is a question that this case does not present.").

[3] Of course, it may be presumptively unreasonable if officers fail entirely to serve a sufficient warrant at any time before, during or immediately after a search of a home. *See United States v. Grubbs*, 377 F.3d 1072, 1079 & n.9 (9th Cir. 2004) (holding that officers violated the Fourth Amendment when they did not serve a sufficient warrant at any point "before, during or after the search" and declining to "decide whether the warrant and curative material must be shown to the persons whose property is being searched *prior* to the officers' entry into the home"); *United States v. McGrew*, 122 F.3d 847, 849-50 (9th Cir. 1997) (holding that officers violated the Fourth Amendment when they did not serve the suspect with a copy of a sufficient warrant during the search of her home or at any time thereafter).

**[4]** We decline to give dispositive weight to the contention that a warrant had to be served at the outset when Martinez-Garcia explicitly advised the officers, who attempted to serve the warrant, that he did not speak English. The Fourth Amendment does not require futile and gratuitous actions that serve no purpose. *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997) (holding that the police need not knock and announce their presence before serving a warrant if it "would be dangerous or futile" to do so); *Peterson*, 353 F.3d at 1049 (holding that a "no-knock" entry was reasonable because requiring officers to announce their presence "would amount to mandating a meaningless act. Announcement would have been futile. . . . The Fourth Amendment's 'touchstone of reasonableness' simply does not mandate the redundant formalism that [the defendant] urges upon us here.") (internal citations omitted). Similarly, under the circumstances of this case, we see no valid reason to engraft upon Fourth Amendment reasonableness analysis a requirement that a document in English be given to a suspect who is unable to understand that language. It was reasonable for police at once to advise Martinez-Garcia in Spanish that the document was a search warrant. It was reasonable for police at once to call for an interpreter who would help Martinez-Garcia understand the specifics of the warrant. It was reasonable for Lozano, as soon as he could be brought to the site, to interpret the warrant for Martinez-Garcia. After considering the totality of the circumstances, we cannot say that the police in executing the search acted unreasonably. The officers did not violate the Fourth Amendment, and suppression of the firearm is not required.

## III

We next consider the challenge to the search asserted under Federal Rule of Criminal Procedure 41.

Martinez-Garcia contends that the district court erred in denying his motion to suppress the firearm because officers failed to serve the warrant at the outset of the search pursuant

to Federal Rule of Criminal Procedure 41(f)(3). Rule 41(f)(3) requires that officers conducting a search "(A) give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken; or (B) leave a copy of the warrant and receipt at the place where the officer took the property." An inquiry into whether a case warrants suppression consists of three parts: 1) whether the search of Martinez-Garcia's home was "federal in character," and therefore subject to the provisions of Rule 41; 2) if Rule 41 applies, whether the officers violated Rule 41(f)(3) by not serving a warrant at the outset of the search on an occupant who did not speak English; 3) if the officers violated Rule 41(f)(3), whether they acted in intentional and deliberate disregard of Rule 41, or whether the defendant was prejudiced as a result, thereby warranting suppression of the firearm.

The Federal Rules of Criminal Procedure do not apply to a search conducted by state officials pursuant to a state warrant merely because the evidence seized is used in a federal prosecution. *United States v. Crawford*, 657 F.2d 1041, 1046 (9th Cir. 1981). In the Ninth Circuit, Rule 41 applies to a search conducted by state officers pursuant to a state warrant only if the search is "federal in character." *United States v. Palmer*, 3 F.3d 300, 303 (9th Cir. 1993) (quoting *Crawford*, 657 F.2d at 1046). Martinez-Garcia argues that the involvement of BICE Agent Lozano in the search and the subsequent prosecution for a federal offense rendered the search "federal in character." Martinez-Garcia also contends that the language of Rule 41 and our interpretation of it in *United States v. Gantt* compel the conclusion that the officers conducting the search of his residence violated Rule 41(f)(3) by not serving the warrant at the outset of their search. 194 F.3d 987, 990 (9th Cir. 1999); *see also United States v. Mann*, 389 F.3d 869, 874-76 (9th Cir. 2004).

**[5]** We determine that we need not resolve whether Rule 41(f)(3) applied to the search of the Martinez-Garcia home and, assuming the Rule applied, whether it was violated

because, even if we assume that the search at 12579 North Applegate Road violated Rule 41(f)(3), suppression of the firearm would not be required by law. Suppression of evidence obtained through a search that violates Federal Rule of Criminal Procedure 41 is required only if: 1) the violation rises to a "constitutional magnitude;" 2) the defendant was prejudiced, in the sense that the search would not have occurred or would not have been so abrasive if law enforcement had followed the Rule; or 3) officers acted in "intentional and deliberate disregard" of a provision in the Rule. *Crawford*, 657 F.2d at 1047; *United States v. Johnson*, 660 F.2d 749, 753 (9th Cir. 1981); *see also United States v. Calandra*, 414 U.S. 338, 348 n.6 (1974) (holding that Rule 41 provisions governing suppression do "not constitute a statutory expansion of the exclusionary rule").[4]

[6] We have already held that the search did not violate the Fourth Amendment; there is not a constitutional violation. Thus, the dispositive issues become whether Martinez-Garcia was prejudiced by the assumed technical violation of Rule 41(f)(3), and whether the assumed non-compliance shows an "intentional and deliberate disregard" for the Rule's requirements.

[7] Here, Martinez-Garcia was not prejudiced by the officers' decision to hold the warrant for service until after an interpreter arrived, rather than serving it at the outset of the search. Martinez-Garcia did not speak English and would have gained nothing by being handed a document that he could not understand. Despite the language barrier, Raymond provided limited notice by showing Martinez-Garcia the "paperwork" and stating that he had an "orden de registro." Equally important, it is unlikely that Martinez-Garcia would have been able to prevent the discovery of the handgun, given

---

[4]We review de novo a district court's decision not to suppress evidence and review for clear error the district court's underlying factual findings. *Gantt*, 194 F.3d at 1000.

that it was within the lawful scope of the search. Finally, Martinez-Garcia himself admitted to Lozano that he possessed a handgun and disclosed its location in the master bedroom. So we see no prejudice.

**[8]** We also conclude that the district court did not clearly err in finding that the JOINT officers serving the warrant did not act in intentional or deliberate disregard of Rule 41. The officers had good faith reasons to hold the warrant in the face of Martinez-Garcia's claimed inability to understand English, and the officers proceeded reasonably to gain the help of an interpreter who could review the warrant with Martinez-Garcia before the search was concluded. We hold that the district court correctly denied Martinez-Garcia's motion to suppress the firearm seized during the March 21, 2003 search of his residence.

## IV

We finally address Martinez-Garcia's *Franks* challenge.

A hearing pursuant to *Franks v. Delaware* allows a defendant to challenge the sufficiency of an affidavit supporting a search warrant if he or she makes a "substantial preliminary showing" both that law enforcement officers made a false statement or omission "knowingly and intentionally, or with reckless disregard for the truth," and that the statement or omission was "necessary to the finding of probable cause." 438 U.S. at 155-56. Martinez-Garcia contends that Jenista knowingly or recklessly omitted the following information, that, if included in the warrant affidavit, would have negated probable cause: 1) Juan Carlos Martinez-Garcia worked at the Noble Dairy in November 2002; 2) Juan Carlos no longer lived at 12579 North Applegate Road; 3) Juan Carlos and Salvador Martinez-Garcia were brothers; 4) a third Martinez-Garcia brother, Daniel, also lived at the Noble Dairy; 5) Salvador Martinez-Garcia occupied the house that was the subject of the search warrant; 6) the named informant, Brian

Doland, had pending federal drug charges and expected that JOINT officers would provide a favorable recommendation to prosecutors in consideration for his service as an informant; and 7) Doland had a prior criminal conviction for writing a bad check.

Martinez-Garcia moved for a *Franks* hearing, and the district court partially granted his motion and conducted a hearing limited to the issue of whether Jenista knowingly omitted Doland's criminal conviction for writing a bad check from the warrant affidavit. The district court concluded that affiant Jenista did not act in deliberate or reckless disregard for the truth and that, even considering the bad check conviction, informant Doland nevertheless had "overwhelming" credibility. We first review this conclusion and then consider whether the district court properly denied a *Franks* hearing on Martinez-Garcia's remaining claims.

## A

A district court conducting a *Franks* hearing engages in a two-step process. First, the district court determines whether the affiant officer intentionally or recklessly made false or misleading statements or omissions in support of the warrant. *Franks,* 438 U.S. at 155-56; *United States v. Senchenko*, 133 F.3d 1153, 1158 (9th Cir. 1998). If it finds by a preponderance of the evidence that the officer so acted, the district court then inquires into whether "with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Franks,* 438 U.S. at 156; *Senchenko*, 133 F.3d at 1158.[5]

---

[5]We review for clear error a district court's finding that an affidavit did not contain purposefully or recklessly false statements or omissions and review de novo its determination that the misleading omissions or false information did not undermine a finding of probable cause. *United States v. Elliott*, 322 F.3d 710, 714 (9th Cir. 2003).

We conclude that the district court did not clearly err in finding that Jenista did not act in deliberate or reckless disregard for the truth by omitting from the affidavit a conviction that informant Doland had for writing a bad check. At the *Franks* hearing, Jenista testified that he had run a criminal background check on Doland and located no convictions, and the prosecution offered into evidence a copy of the erroneous criminal background check.

**[9]** A law enforcement officer does not act with deliberate or reckless disregard for the truth if he or she relies in good faith on a flawed routine criminal history. *United States v. Meling*, 47 F.3d 1546, 1554 (9th Cir. 1995). There was no clear error in the district court's conclusion that Jenista did not demonstrate intentional or reckless dishonesty in omitting the bad check conviction from the affidavit. Because Martinez-Garcia has not met his burden with respect to the first prong of the *Franks* inquiry, we do not consider whether he has demonstrated that the omission was material to the finding of probable cause.

**B**

**[10]** The district court denied Martinez-Garcia's motion for a *Franks* hearing with respect to all other information omitted from the warrant affidavit. A defendant is entitled to a hearing to determine the sufficiency of the affidavit supporting a search warrant if he or she makes a "substantial preliminary showing that (1) the affidavit contains intentionally or recklessly false statements or misleading omissions, and (2) the affidavit cannot support a finding of probable cause without the allegedly false information." *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000); *see also Franks*, 438 U.S. at 171-72.[6]

---

[6]We review de novo a district court's denial of a *Franks* hearing. *Reeves*, 210 F.3d at 1044; *Meling*, 47 F.3d at 1553.

**[11]** We first consider the information allegedly minimizing the connection between Juan Carlos and 12579 North Applegate Road, including control over the Martinez-Garcia residence and Juan Carlos's familial and work relationships with the property. Martinez-Garcia presents no evidence that Jenista knew about or purposefully omitted any of this information and instead argues that Jenista acted recklessly in failing to investigate further the connection between Juan Carlos and the Noble Dairy. We disagree. In drawing a connection between Juan Carlos, his methamphetamine distribution activities, and 12579 North Applegate Road, Jenista relied upon information from Doland that he had seen Juan Carlos distribute methamphetamine to Scott in the house on one occasion and had visited there five other times. Jenista also relied on JOINT observation of Doland and Scott entering the Martinez-Garcia house, and on the Oregon Department of Motor Vehicles records reflecting that Juan Carlos lived at that location. Law enforcement officers acting in reasonable reliance on tips from a reliable informant, corroboration through police observation and official driving records need not track down every piece of information that might potentially be relevant before filing a warrant affidavit. We hold that Martinez-Garcia has failed to demonstrate a "substantial preliminary showing" of intentional or reckless disregard for the truth by Jenista regarding the relationship between Juan Carlos and 12579 North Applegate Road. *See Franks*, 438 U.S. at 171. Because Martinez-Garcia has failed to satisfy the first prong of the *Franks* test, we do not consider whether the omissions were material to a finding of probable cause.

**[12]** We turn to the omission of Doland's pending federal drug charges and the deal JOINT made with him to provide a favorable recommendation to prosecutors. Law enforcement officers must ordinarily disclose information regarding whether an informant has ulterior motivations for providing information for a search warrant affidavit. *See Meling*, 47 F.3d at 1553. The record reflects a "substantial preliminary showing" that Jenista knowingly omitted from the affidavit

information related to incentives he provided to Doland — indeed, the evidence on this point appears uncontroverted. *See Franks*, 438 U.S. at 171-72. We therefore hold that Martinez-Garcia has met the first prong of the *Franks* test with respect to Doland's pending federal drug charges.

## C

**[13]** With respect to the favorable recommendation regarding the federal drug charges only, we next turn to the materiality prong and determine whether, if this information is considered, the affidavit nevertheless supports a finding of probable cause.[7] Probable cause exists if the affidavit provides a "substantial basis" for believing that criminal activity might have been occurring at the Martinez-Garcia residence on 12579 North Applegate Road. *See Illinois v. Gates*, 462 U.S. 213, 235-37 (1983); *United States v. Alvarez*, 358 F.3d 1194, 1202-04 (9th Cir. 2004). In making this evaluation, we consider the credibility of the informant, including his history of providing reliable information in previous investigations and any prior criminal convictions for crimes of dishonesty. *Elliott*, 322 F.3d at 715-16; *Reeves*, 210 F.3d at 1045. Also, we examine whether the informant's information was bolstered by independent police investigation of the tip or corroboration by other confidential informants. *Alvarez*, 358 F.3d at 1203; *United States v. Bishop*, 264 F.3d 919, 925-26 (9th Cir. 2001).

Here, the affidavit supporting the warrant detailed the investigation into methamphetamine distribution by Juan Carlos, Hernandez-Salazar, and Contreras and tied their illegal

---

[7]We review de novo whether, in light of deliberately or recklessly false statements or omissions, probable cause nevertheless supports a warrant. *Elliott*, 322 F.3d at 714. Because Martinez-Garcia failed to make a substantial preliminary showing of knowing or reckless disregard for the truth with respect to the other information, we do not consider whether it also would fail the materiality prong of the *Franks* test.

activities to the Martinez-Garcia residence at 12579 North Applegate Road. Doland, a named informant who had never failed a polygraph test and had a history of providing credible information to law enforcement, told JOINT officers that he and Scott met with Juan Carlos in an unsuccessful attempt to purchase methamphetamine at the Noble Dairy. JOINT officers corroborated his story by observing Doland and Scott arrive at, enter, and leave the Martinez-Garcia home. Doland further told the police that he had observed Juan Carlos sell methamphetamine to Scott at 12579 North Applegate Road on one other occasion and had been to the house about five additional times since November 2002. In addition, Doland successfully bought methamphetamine from Juan Carlos at the home of Hernandez-Salazar, and JOINT officers corroborated this through surveillance, field testing of the methamphetamine and tips from other confidential informants. Jenista verified with the Oregon Department of Motor Vehicles that Juan Carlos lived at 12579 North Applegate Road. Finally, insofar as the affidavit indicated that Doland had provided information for monetary consideration, it did not characterize his motives as altogether pure. *Cf. Meling*, 47 F.3d at 1553.

**[14]** Considering this information along with the omitted information regarding Doland's pending federal drug charges, we conclude that the "totality of the circumstances" still indicates probable cause to search the Martinez-Garcia home. *See Gates*, 462 U.S. at 238. Probable cause requires a fair probability, but not a certainty, that a search would yield evidence of crime. *Gates*, 462 U.S. at 231-32. The affidavit detailed ample evidence that criminality was afoot at the premises to be searched. The omission of Doland's pending federal drug charge from the affidavit does not affect the conclusion that there was probable cause for the search of the Martinez-Garcia home. The district court correctly denied his motion for a hearing.

   **AFFIRMED**.